PENDER COUNTY, DWIGHT STRICKLAND, INDIVIDUALLY AND AS A PENDER COUNTY COMMISSIONER, DAVID WILLIAMS, INDIVIDUALLY AND AS A PENDER COUNTY COMMISSIONER, F.D. RIVENBARK, INDIVIDUALLY AND AS A PENDER COUNTY COMMISSIONER, STEPHEN HOLLAND, INDIVIDUALLY AND AS A PENDER COUNTY COMMISSIONER, AND EUGENE MEADOWS, INDIVIDUALLY AND AS A PENDER COUNTY COMMISSIONER v. GARY BARTLETT, AS EXECUTIVE DIRECTOR OF THE NORTH CAROLINA STATE BOARD OF ELECTIONS; LARRY LEAKE, ROBERT CORDLE, GENEVIEVE C. SIMS, LORRAINE G. SHINN, AND CHARLES WINFREE, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE STATE BOARD OF ELECTIONS; JAMES B. BLACK, IN HIS OFFICIAL CAPACITY AS CO-SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES; RICHARD T. MORGAN, IN HIS OFFICIAL CAPACITY AS CO-SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES; MARC BASNIGHT, IN HIS OFFICIAL CAPACITY AS PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE; MICHAEL EASLEY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF NORTH CAROLINA; AND ROY COOPER, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA

No. 103A06

(Filed 24 August 2007)

### 1. Elections— redistricting—appeal from three-judge panel— directly to Supreme Court

An appeal from a summary judgment by a three-judge panel upholding a redistricting across county boundaries was directly to the Supreme Court. Although N.C.G.S. § 120-5 authorizes direct appeals to the Supreme Court from final orders declaring redistricting acts invalid, the General Assembly did not intend to limit appeals to one type of outcome. Any appeal from a three-judge panel dealing with apportionment or redistricting pursuant to N.C.G.S. § 1-267.1 is directly to the Supreme Court.

### 2. Elections— redistricting—Voting Rights Act—vote dilution—numerical majority as precondition

The current configuration of a North Carolina legislative district was not required by Section 2 of the Voting Rights Act (VRA), which prohibits vote dilution. The conditions in *Thornburg v. Gingles*, 478 U.S. 30, must be satisfied before Section 2 applies; here, only the first condition is at issue (a minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district). This provision refers to the voting age citizens rather than the entire population of the minority group, and a numerical majority is required rather than a smaller number that needs to draw votes from other racial groups to control the outcome of an election. Because the African-American minority group in this district does not constitute a numerical majority of citizens of voting age,

the first *Gingles* precondition is not met and the current configuration of the district is not required by Section 2 of the Voting Rights Act.

**3. Elections— redistricting—Whole County Provision— violation**

A legislative district which was not subject to the federal Voting Rights Act (VRA) was required to comply with the Whole County Provision (WCP) of the North Carolina Constitution and with *Stephenson v. Bartlett*, 355 N.C. 354, and did not. The county involved, Pender, was divided into two districts, with population from an adjoining county added to both, in anticipation of Voting Rights Act requirements which did not apply. Because Pender lacks sufficient population to meet the requirements for a non-VRA district, population from across a county line must be added, but only to the extent necessary to comply with the one-person, one-vote standard in *Stephenson*. The precise remedy is a legislative responsibility. N.C. Const. art. II, §§ 3(3), 5(3).

**4. Elections— redistricting error—remedy stayed for election**

The remedy for a redistricting erroneously drawn was stayed until after a pending election.

Justice HUDSON did not participate in the consideration or decision of this case.

Chief Justice PARKER dissenting.

Justice TIMMONS-GOODSON joins in this dissenting opinion.

Justice TIMMONS-GOODSON dissenting.

Appeal pursuant to N.C.G.S. § 120-2.5 from an order entered 2 December 2005 and a judgment entered 9 January 2006 by a three-judge panel of the Superior Court, Wake County appointed by the Chief Justice under N.C.G.S. § 1-267.1. Heard in the Supreme Court 13 September 2006.

*Carl W. Thurman III for plaintiff-appellants Dwight Strickland, David Williams, and Stephen Holland, in their individual capacities.*

*Roy Cooper, Attorney General, by Tiare B. Smiley and Alexander McC. Peters, Special Deputy Attorneys General, for defendant-appellees.*

PENDER CTY. v. BARTLETT

[361 N.C. 491 (2007)]

*Center for Civil Rights, University of North Carolina School of Law, by Anita S. Earls, for Cindy Moore, Milford Farrior, and Mary Jordan, amici curiae.*

EDMUNDS, Justice.

In this case, we consider whether the current geographic configuration and racial composition of North Carolina House District 18 as established by the North Carolina General Assembly was required by Section 2 of the Voting Rights Act of 1965.[1] We conclude that the Voting Rights Act did not mandate the creation of a Section 2 "crossover" district and that House District 18 violates the Whole County Provision of the Constitution of North Carolina. Accordingly, we reverse the decision of the three-judge panel below.

The General Assembly's redistricting powers are confined and directed in several respects. In the first instance, redistricting "must comport with federal law." *Stephenson v. Bartlett*, 355 N.C. 354, 363, 562 S.E.2d 377, 384 *(Stephenson I)*, *stay denied*, 535 U.S. 1301, 152 L. Ed. 2d 1015 (Rehnquist, Circuit Justice 2002). In addition, the Constitution of North Carolina enumerates several limitations on the General Assembly's redistricting authority. *See* N.C. Const. art. II, §§ 3, 5. Those constitutional limitations are binding upon the General Assembly "except to the extent superseded by federal law." *Stephenson I*, 355 N.C. at 372, 562 S.E.2d at 390. None of the express limitations on redistricting in our State Constitution is facially inconsistent with federal law. *Id.* at 370, 562 S.E.2d at 389.

Two constitutional sections limiting redistricting, collectively known as the "Whole County Provision" (WCP), provide "[n]o county shall be divided in the formation of a senate district," N.C. Const. art. II, § 3(3), and "[n]o county shall be divided in the formation of a representative district," *id.* art. II, § 5(3). Although federal law is supreme, when "the primary purpose of the WCP can be effected to a large degree without conflict with federal law, it should be adhered to by the General Assembly to the maximum extent possible." *Stephenson I*, 355 N.C. at 374, 562 S.E.2d at 391. Moreover, "the WCP cannot be applied in isolation or in a manner that fails to comport with other requirements of the State Constitution." *Id.* at 376, 562 S.E.2d at 392.

---

1. House District 16 also lies in Pender County and perforce is affected by our holding today. However, we shall follow the lead of the parties and the three-judge panel and focus solely on House District 18.

Based upon data from the 2000 decennial census, an ideal single-member North Carolina House district holds 67,078 citizens. According to that census, Pender County had 41,082 residents, or 61 percent of the population required to support its own House district. That census also indicated that adjoining New Hanover County had 160,307 residents, or 239 percent of the population needed for a single House district. Combining these two counties provided the population for approximately three House districts.

The district in question, House District 18, was drawn after this Court determined that earlier redistricting efforts by the North Carolina General Assembly failed to meet federal and state standards. In *Stephenson I*, we held that the General Assembly's 2001 state House and Senate legislative redistricting plans violated the State Constitution's WCP. 355 N.C. at 375, 562 S.E.2d at 392. Similarly, in *Stephenson II*, this Court held that the General Assembly's proposed 2002 redistricting plans were also constitutionally deficient. *Stephenson v. Bartlett*, 357 N.C. 301, 314, 582 S.E.2d 247, 254 (2003) (*Stephenson II*). In the 2003 House redistricting plan promulgated after the two *Stephenson* opinions, Pender County was divided between two legislative districts, House District 16 and House District 18. Act of Nov. 25, 2003, ch. 434, secs. 1-2, 2003 N.C. Sess. Laws (1st Extra Sess. 2003) 1313, 1313-92. Both districts encompass portions of Pender and New Hanover Counties and thus cross county lines. *Id.*, sec. 1 at 1327-30.

The General Assembly drew House District 18 to meet the requirements of Section 2 of the Voting Rights Act of 1965 (VRA), codified as amended at 42 U.S.C. § 1973 (2003). Section 2 of the VRA, which we discuss in detail below, "generally provides that states or their political subdivisions may not impose any voting qualification or prerequisite that impairs or dilutes, on account of race or color, a citizen's opportunity to participate in the political process and to elect representatives of his or her choice." *Stephenson I*, 355 N.C. at 363, 562 S.E.2d at 385 (citing 42 U.S.C. §§ 1973(a), (b); *Thornburg v. Gingles*, 478 U.S. 30, 43, 92 L. Ed. 2d 25, 42 (1986)). Past election results in North Carolina demonstrate that a legislative voting district with a total African-American population of at least 41.54 percent, or an African-American voting age population of at least 38.37 percent, creates an opportunity to elect African-American candidates. Accordingly, in the 2003 House redistricting plan, the General Assembly fashioned House District 18 with a total African-American population of 42.89 percent, and an African-American voting age pop-

ulation of 39.36 percent. Defendants refer to House District 18 as an "effective black voting district," with a sufficient African-American population to elect representatives of their choice.

On 14 May 2004, plaintiffs brought the instant action. Pender County was a named plaintiff, as were five persons suing both as individuals and in their official capacities as county commissioners of Pender County. Defendants, consisting of the Executive Director and members of the North Carolina Board of Elections, the then co-Speakers of the North Carolina House of Representatives, the President Pro Tempore of the North Carolina Senate, the Attorney General, and the Governor of the State of North Carolina, were all sued in their official capacities. In their complaint, plaintiffs contended that the 2003 House redistricting plan violated the WCP by dividing Pender County into House District 16 and House District 18. Defendants responded that the division of Pender County was required by Section 2 of the VRA, which trumped the State Constitution.

Pursuant to N.C.G.S. § 1-267.1(b), on 24 May 2004 the Chief Justice appointed a three-judge panel to hear this redistricting challenge. Plaintiffs first sought a preliminary injunction to enjoin defendants from proceeding with the 2004 primary and general elections. The panel denied the injunction. On 25 February 2005, the parties filed cross-motions for summary judgment, followed by initial and amended stipulations of fact.

On 2 December 2005, the three-judge panel entered an order allowing partial summary judgment in favor of defendants and denying summary judgment for plaintiffs. In its order, the panel determined that plaintiff Pender County and its commissioners lacked standing to sue in their official capacity, although the commissioner-plaintiffs could proceed in their individual capacities. Plaintiffs do not appeal this determination. Next, the panel examined House District 18 in light of the United States Supreme Court's decision in *Thornburg v. Gingles*, the leading case interpreting Section 2. *Gingles* set out three "necessary preconditions" a plaintiff is required to demonstrate before he or she can establish that a legislative district must be drawn to comply with Section 2 or that an existing district violates Section 2. 478 U.S. at 50, 92 L. Ed. 2d at 46. These preconditions require a plaintiff to show that: (1) a minority population is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority population is "politically cohesive" and thus votes as a bloc; and (3) the majority

population "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50-51, 92 L. Ed. 2d at 46-47. By demonstrating these three preconditions, a plaintiff can show that a particular legislative district may "impair minority voters' ability to elect representatives of their choice." *Id.* at 50, 92 L. Ed. 2d at 46.

As the three-judge panel noted, the procedural posture of the case at bar differs from a typical Section 2 case. Here, defendants drew House District 18 as a preemptive measure against the possibility that a lawsuit might be filed challenging the absence of a Section 2 district in southeastern North Carolina. Plaintiffs claim that the current configuration of House District 18 was not required by Section 2 and that the District violates the WCP, thus placing defendants in the unusual position of having to defend a legislative district by proving that a Section 2 violation would have occurred if current House District 18 had not been created. Accordingly, defendants here must bear the burden, normally borne by plaintiffs, of establishing the *Gingles* preconditions. If they succeed, defendants can demonstrate that the drawing of House District 18 was required by Section 2, obviating the need to comply with the WCP.

The three-judge panel held that House District 18 met the first two *Gingles* preconditions but determined that material issues of fact remained as to whether the third precondition had been satisfied. Because the panel did not reach the issue of whether House District 18 met the third precondition, it declined to consider whether the district also met the "totality of circumstances" test prescribed by *Gingles* and Section 2 of the VRA. *Gingles*, 478 U.S. at 43, 92 L. Ed. 2d at 42 (quoting 42 U.S.C. § 1973(b)) (explaining that Section 2 is violated when the "totality of the circumstances" establishes that members of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice").

Following the order of partial summary judgment, the parties on 9 January 2006 filed another joint stipulation that the Caucasian majority voted sufficiently as a bloc to enable it usually to defeat the African-American minority's preferred candidate. Through this stipulation, plaintiffs conceded House District 18 met the third *Gingles* precondition. However, plaintiffs did not stipulate that House District 18 was required by Section 2 of the VRA.

With the issues of material fact resolved as to the third precondition, the three-judge panel issued its final summary judgment order on 9 January 2006. The panel concluded House District 18 met all three of the *Gingles* threshold preconditions and, based on the totality of circumstances, the creation of House District 18 as a crossover district (i.e., one where the minority group enjoys reliable support from members of the majority who "cross over" racial or ethnic lines to vote with the minority and elect the minority's candidate) was required by Section 2 of the VRA. Accordingly, the panel held that House District 18 could split Pender County and that the district complied, to the maximum extent practicable, with the legal requirements of the WCP, as set out in *Stephenson I*.

[1] Three of the five individual plaintiffs appealed to this Court pursuant to N.C.G.S. § 120-2.5. Although neither party has raised the issue of jurisdiction, we note that this statute authorizes direct appeal to this Court "from any final order or judgment of a court declaring unconstitutional or otherwise invalid in whole or in part and for any reason any act of the General Assembly that apportions or redistricts State legislative or congressional districts." N.C.G.S. § 120-2.5 (2005). While the three-judge panel did not declare the 2003 House redistricting plan unconstitutional or invalid, we do not believe the General Assembly intended to limit appeals of the findings of such a three-judge panel to one type of outcome only. This view is supported by a later part of the same session law that enacted § 120-2.5, which provides that the appeal provision applies to "*any* action of a court *affecting the validity* of an act apportioning or redistricting State legislative or congressional districts." Ch. 434, sec. 16, 2003 N.C. Sess. Laws (1st Extra Sess. 2003) at 1419 (emphasis added). Accordingly, we interpret N.C.G.S. § 120-2.5 to mean that any appeal from a three-judge panel dealing with apportionment or redistricting pursuant to N.C.G.S. § 1-267.1 is direct to this Court. We now consider whether the VRA required that House District 18 be drawn in its current form as a crossover district.

[2] An order allowing summary judgment is reviewed *de novo*. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2005). An act of the General Assembly is accorded a "strong presumption of constitutionality" and is "presumed valid *unless it conflicts with the Constitution*." *Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam).

Section 2 of the VRA forbids any "qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group. 42 U.S.C. § 1973(a) (2003). A denial or abridgement of the right to vote in violation of Section 2 occurs when:

> [B]ased on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

*Id.* § 1973(b) (2003). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed" by minority voters to elect their preferred representatives. *Gingles,* 478 U.S. at 47, 92 L. Ed. 2d at 44.

Consequently, Section 2 prohibits the dilution, on account of race or color, of a minority citizen's opportunity to participate in the political process and to elect representatives of his or her choice. *Stephenson I,* 355 N.C. at 363, 562 S.E.2d at 385. Although the phrase "vote dilution" does not appear in Section 2, the United States Supreme Court has provided guidance on this issue. Vote dilution of a racial minority group can occur "by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Gingles,* 478 U.S. at 46 n.11, 92 L. Ed. 2d at 44 n.11. "The phrase 'vote dilution,' in the legal sense, simply refers to the impermissible discriminatory effect that a . . . districting plan has when it operates 'to cancel out or minimize the voting strength of racial groups.' " *Id.* at 87, 92 L. Ed. 2d at 70 (O'Connor, J., concurring) (quoting *White v. Regester,* 412 U.S. 755, 765, 37 L. Ed. 2d 314, 324 (1973)); *see also Reno v. Bossier Parish Sch. Bd.,* 528 U.S. 320, 359, 145 L. Ed. 2d 845, 875 (2000) (Souter, J., concurring in part and dis-

senting in part) ("The principal concept of diminished voting strength recognized as actionable under our cases is vote dilution, defined as a regime that denies to minority voters the same opportunity to participate in the political process and to elect representatives of their choice that majority voters enjoy.").

Although courts ultimately apply a totality of the circumstances test to determine whether a practice results in a denial or abridgement of the right to vote, 42 U.S.C. § 1973(b), a plaintiff bringing a claim under Section 2 must first establish the three *Gingles* threshold preconditions. In the case at bar, plaintiffs argue, and defendants do not dispute, that these three preconditions must exist before the General Assembly is required to draw a legislative district pursuant to Section 2. Failure to sustain any one of the *Gingles* preconditions means that the General Assembly is not required to create a legislative district pursuant to Section 2 to ensure that the votes of the minority are not diluted. *See Voinovich v. Quilter*, 507 U.S. 146, 158, 122 L. Ed. 2d 500, 514 (1993).

While *Gingles* construed Section 2 in the context of a lawsuit concerning dilution in a multi-member legislative district, the Supreme Court subsequently applied the *Gingles* preconditions to single-member legislative districts. "[A] claim of vote dilution in a single-member district requires proof meeting the same three threshold conditions for a dilution challenge to a multimember district." *Johnson v. De Grandy*, 512 U.S. 997, 1006, 129 L. Ed. 2d 775, 788 (1994) (citing *Growe v. Emison*, 507 U.S. 25, 40, 122 L. Ed. 2d 388, 403-04 (1993)). Thus, the *Gingles* preconditions must be found before Section 2 requires the General Assembly to create a single-member district on behalf of a minority group. In other words, the existing configuration and makeup of House District 18 was not required by Section 2 unless all three *Gingles* preconditions were established.

Only the first *Gingles* precondition is at issue in this appeal. The narrow question before us is whether this precondition, that a minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," 478 U.S. at 50, 92 L. Ed. 2d at 46, requires that the minority group constitute a numerical majority of the relevant population, or whether a numerous minority can satisfy the precondition. We must determine whether the United States Supreme Court in *Gingles* meant a quantitative majority of the minority population (i.e., greater than 50 percent), or whether it meant instead a minority group sufficiently

large in population to have significant impact on the election of candidates but not of a size to control the outcome without help from other racial groups. The Supreme Court explicitly left open this question in *Gingles*, 478 U.S. at 46 n.12, 92 L. Ed. 2d at 44 n.12, and has not answered it in several cases since. *League of United Latin Am. Citizens v. Perry*, 126 S. Ct. 2594, 2647-48, 165 L. Ed. 2d 609, 672-73 (2006) (Souter, J., concurring in part and dissenting in part); *De Grandy*, 512 U.S. at 1008-09, 129 L. Ed. 2d at 789-90; *Voinovich*, 507 U.S. at 154, 122 L. Ed. 2d at 511; *Growe*, 507 U.S. at 41 n.5, 122 L. Ed. 2d at 404 n.5.

Before we can answer that question, however, we must determine "which characteristic of minority populations (*e.g.*, age, citizenship) ought to be the touchstone" for the first *Gingles* precondition. *De Grandy*, 512 U.S. at 1008, 129 L. Ed. 2d at 789. We cannot discuss the terms "minority" and "majority" in the context of a redistricting case without knowing what population we are considering. In other words, a "majority" or "minority" of *what*? Are we including the entire population of the minority group in the geographic area or are we limiting consideration to a smaller subset of that minority population? Although the United States Supreme Court has left open this question as well, *id.* at 1008-09, 129 L. Ed. 2d at 789-90, dictum in *Perry* from a unanimous Court indicates a majority should be determined by the number of minority citizens of voting age, not by its total population: "Latinos, to be sure, are a bare majority of the voting-age population in new District 23, but only in a hollow sense, for the parties agree that the relevant numbers must include citizenship. This approach fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates." *Perry*, 126 S. Ct. at 2616, 165 L. Ed. 2d at 638.

In addition, the plain language of Section 2 indicates citizenship should be taken into account in that the statute prohibits any "qualification or prerequisite to voting . . . which results in a denial or abridgement of the right of any *citizen of the United States* to vote on account of race." 42 U.S.C. § 1973(a) (emphasis added). As *Gingles* explained:

> The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters *possess the potential to elect representatives* in the absence of the challenged structure

or practice, they cannot claim to have been injured by that structure or practice.

478 U.S. at 50 n.17, 92 L. Ed. 2d at 46 n.17 (emphasis added). *Gingles* "repeatedly makes reference to effective voting majorities, rather than raw population totals, as the touchstone for" determining the first precondition. *Romero v. City of Pomona*, 883 F.2d 1418, 1425 (9th Cir. 1989), *overruled in part on other grounds, Townsend v. Holman Consulting Corp.*, 929 F.2d 1358 (9th Cir. 1991). "The *raison d'etre* of [*Gingles*] and of amended § 2 is to facilitate participation by minorities in our political processes, by preventing dilution of their votes. . . . It would be a Pyrrhic victory for a court to create a single-member district in which a minority population dominant in absolute, but not in voting age numbers, continued to be defeated at the polls." *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997) (quotation omitted). Because only voting age citizens of the United States possess the ability to elect candidates, we hold that the "proper statistic" for deciding whether a minority group can meet the first *Gingles* precondition is "voting age population as refined by citizenship." *Negrón v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997); *see also Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998) ("We think that citizen voting-age population is the basis for determining equality of voting power that best comports with the policy of [Section 2].<sup></sup>"), *cert. denied sub nom. Bialczak v. Barnett*, 524 U.S. 954, 141 L. Ed. 2d 740 (1998).

We now return to the critical question on appeal, whether the "sufficiently large and geographically compact" minority population must constitute a numerical majority of citizens of voting age in order to satisfy the first *Gingles* precondition. As we undertake this analysis, we are mindful of at least four distinct types of legislative districts: (1) "majority-minority" districts, (2) "coalition" districts, (3) "crossover" districts, and (4) "influence" districts. A majority-minority district is one "in which a majority of the population is a member of a specific minority group." *Voinovich*, 507 U.S. at 149, 122 L. Ed. 2d at 508. Majority-minority districts are often called "safe" districts for the minority because the minority group voters can vote as a bloc to elect the candidates of their choice without relying on voters of other races.

By contrast, in the other types of legislative districts, the predominant minority group cannot consistently elect its candidate of choice without the assistance of other racial groups. Absent such

help, even if every eligible member of the minority group voted for a single candidate, that candidate would not be assured of electoral success. Thus, a coalition district is one in which a minority group joins with voters from at least one other minority group to elect a candidate. *De Grandy*, 512 U.S. at 1020, 129 L. Ed. 2d at 796; *see also Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887, 904 (D. Ariz. 2005) ("A coalition district is one in which two separate minority groups allege that a district could be formed in which they could join forces to elect a representative."). In a crossover district, a minority group has "support from a limited but reliable white crossover vote." *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 376 (S.D.N.Y.) (per curiam), *aff'd mem.*, 543 U.S. 997, 160 L. Ed. 2d 454 (2004). The terms "coalition" district and "crossover" district are sometimes used interchangeably, but we distinguish them here because the former refers to two or more minority groups combining forces to elect a candidate, while the latter refers to a minority group gaining support from voters in the dominant racial majority group. Finally, an influence district is one in which a minority group is merely large enough to influence the election of candidates but too small to determine the outcome. *Georgia v. Ashcroft*, 539 U.S. 461, 470, 156 L. Ed. 2d 428, 445 (2003) (defining an influence district as one in which a minority group "would be able to exert a significant—if not decisive—force in the election process").

Plaintiffs contend that a minority group must constitute a numerical majority of the voting population in the area under consideration before Section 2 of the VRA requires the creation of a legislative district to prevent dilution of the votes of that minority group. They point to the wording of the first *Gingles* precondition, which says a minority group must be "sufficiently large and geographically compact to constitute a *majority* in a single-member district," 478 U.S. at 50, 92 L. Ed. 2d at 46 (emphasis added), and claim this language permits only majority-minority districts to be formed in response to a Section 2 claim. Defendants respond that the language of both *Gingles* and Section 2 allows for other types of legislative districts, such as coalition, crossover, and influence districts. House District 18, which defendants term an "effective minority district," functions as a single-member crossover district in which the total African-American voting age population of 39.36 percent needs to draw votes from a Caucasian majority to elect the candidate of its choice. Defendants contend such a crossover district is permitted by Section 2 and *Gingles*.

Our analysis leads us to the conclusion that plaintiffs' position is both more logical and more readily applicable in practice. As noted above, while *Gingles* addresses multi-member districts, its analysis also applies to single-member districts. *De Grandy*, 512 U.S. at 1006-07, 129 L. Ed. 2d at 788. The first *Gingles* precondition is premised on initial proof that a single-member district could be constructed with a majority of minority voters. *Gingles*, 478 U.S. at 50 n.17, 92 L. Ed. 2d at 46 n.17. *Gingles* further states that the single-member district "is generally the appropriate standard against which to measure minority group potential to elect" candidates in a multi-member district. *Id.* In light of *Gingles'* use of a numerical majority of a minority group's voters to calibrate the minority's ability to elect its candidate in a multi-member district, we see no reason to use a quantity less than a numerical majority as the determinant in a single-member district. *See Hastert v. State Bd. of Elections*, 777 F. Supp. 634, 654 (N.D. Ill. 1991) (three-judge panel) ("The concerns animating the *Gingles* electoral majority precondition for multi-member cases—concerns of proof and relief—reside equally in the single-member context.").

Although the United States Supreme Court has left open this issue, the majority of federal circuit courts confronting the question have concluded that, when a district must be created pursuant to Section 2, it must be a majority-minority district. *See, e.g., Hall .v. Virginia*, 385 F.3d 421, 423 (4th Cir. 2004) (holding "*Gingles* establishes a numerical majority requirement for all Section 2 claims"), *cert. denied*, 544 U.S. 961, 161 L. Ed. 2d 602 (2005); *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 850 (5th Cir. 1999) (holding "we reject the appellants' contention that a 'majority' may be less than 50% of the citizen voting-age population"), *cert. denied*, 528 U.S. 1114, 145 L. Ed. 2d 811 (2000); *Negrón*, 113 F.3d at 1571 (11th Cir.) (plaintiffs failed to establish first *Gingles* precondition when Hispanics did not "constitute a majority of potential voters")[2]; *Sanchez v. Colorado*, 97 F.3d 1303, 1314 (10th Cir. 1996) (noting that "satisfaction of the first precondition requires plaintiffs show a majority-Hispanic district is feasible"), *cert. denied sub nom.*

---

2. Despite the holding in *Negrón*, a later Eleventh Circuit case purports in a footnote to "leave open the question of whether a section 2 plaintiff can pursue a 'coalition' or 'crossover' dilution claim." *Dillard v. Baldwin County Comm'rs*, 376 F.3d 1260, 1269 n.7 (11th Cir. 2004). We note without further comment an Eleventh Circuit "absolute rule that a prior decision of the circuit (panel or en banc) [cannot] be overruled by a panel but only by the court sitting en banc." *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc); *accord Va. Props., Inc. v. Home Ins. Co.*, 74 F.3d 1131, 1132 n.2 (11th Cir. 1996) (citing *Bonner* and other authority).

*Colorado v. Sanchez*, 520 U.S. 1229, 137 L. Ed. 2d 1028 (1997); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 945 (7th Cir. 1988) (first *Gingles* precondition requires a minority group to have a "voting age majority" of population), *cert. denied*, 490 U.S. 1031, 104 L. Ed. 2d 204 (1989). The issue is unresolved in two circuits. *Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (en banc) (per curiam) (holding "[w]e are thus unwilling *at the complaint stage* to foreclose the possibility that a section 2 claim can ever be made out" with a minority population of 21 percent) (emphasis changed); *Romero*, 883 F.2d at 1424 n.7, 1427 n.15 (9th Cir.) (straddling the fence via two footnotes, first noting that "[w]e are aware of no successful section 2 voting rights claim ever made without a showing that the minority group was capable of a majority vote in a designated single district," but also "express[ing] no opinion as to whether section 2's protections extend to a *coalition* of racial or language minorities"). No circuit has agreed with defendants and affirmatively held that Section 2 can be satisfied by the creation of coalition, crossover, or influence districts.

We find these cases to be sensible and persuasive. When a minority group lacks a numerical majority in a district, "the ability to elect candidates of their own choice was never within the [minority group's] grasp." *Hall*, 385 F.3d at 430. If a minority group lacks the voting population "to independently decide the outcome of an election," it cannot demonstrate that its voting strength has been diluted in violation of Section 2 because it cannot show that any electoral structure or practice has thwarted its ability or potential to elect candidates of its choice. *Id.* at 429. "Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by [a vote-diluting] structure or practice." *Gingles*, 478 U.S. at 50 n.17, 92 L. Ed. 2d at 46 n.17; *see also Hall*, 385 F.3d at 429.

Several federal cases have described this interpretation as imposing a "bright line rule." *See McNeil*, 851 F.2d at 944 (the *Gingles* preconditions can be viewed as a "brightline requirement" that the minority voters make up the majority of the district); *Valdespino*, 168 F.3d at 852 ("[T]his court has interpreted the *Gingles* factors as a bright line test."). This bright line rule, requiring a minority group that otherwise meets the *Gingles* preconditions to constitute a numerical majority of citizens of voting age, can be applied fairly, equally, and consistently throughout the redistricting process. With a straightforward and easily administered standard, Section 2 legislative districts will be more uniform and less susceptible to ephemeral political vot-

ing patterns, transitory population shifts, and questionable predictions of future voting trends. A bright line rule for the first *Gingles* precondition "promotes ease of application without distorting the statute or the intent underlying it." *McNeil*, 851 F.2d at 942.

In addition, a bright line rule provides our General Assembly a safe harbor for the redistricting process. Redistricting should be a legislative responsibility for the General Assembly, not a legal process for the courts. Without a majority requirement, each legislative district is exposed to a potential legal challenge by a numerically modest minority group with claims that its voting power has been diluted and that a district therefore must be configured to give it control over the election of candidates. In such a case, courts would be asked to decide just how small a minority population can be and still claim that Section 2 mandates the drawing of a legislative district to prevent vote dilution. "[A]n unrestricted breach of this precondition 'w[ould] likely open a Pandora's box of marginal Voting Rights Act claims by minority groups of all sizes.' " *Dillard*, 376 F.3d at 1268 (quoting *Hastert*, 777 F. Supp. at 654 (alterations in original)). "The first *Gingles* precondition provides a gate-keeping mechanism by which the courts maintain" ascertainable and objective standards from which to adjudicate Section 2 claims. *Id.* Although we acknowledge that a bright line rule "might conceivably foreclose a meritorious claim," in general it "ensure[s] that violations for which an effective remedy exists will be considered while appropriately closing the courthouse to marginal claims." *McNeil*, 851 F.2d at 943. "In making that trade-off, the *Gingles* majority justifiably sacrificed some claims to protect stronger claims and promote judicial economy." *Id.*

Besides the advantages of a bright line rule requiring a minority group to have a numerical majority of citizens of voting age, we are also advertent to the disadvantages of coalition, crossover, and influence districts. Without a rule requiring a numerical majority of citizens of voting age, "there appears to be no logical or objective measure for establishing a threshold minority group size necessary" for Section 2 legislative districts. *Hastert*, 777 F. Supp. at 654. In addition, courts could be called upon to divine whether coalitions would hold together through biennial and quadrennial election cycles, whether a majority group would continue to cross over through the election cycles, whether one minority group would consistently support another minority group's primary election candidate, what percentage of a minority group would vote with or against that minority, whether the claims of one minority group are superior to those of

another minority group, and so on. We do not believe the political process is enhanced if the power of the courts is consistently invoked to second-guess the General Assembly's redistricting decisions.

We also recognize a specific tension in the *Gingles* preconditions if crossover districts are permitted to satisfy Section 2 requirements. A crossover district is premised upon a minority group gaining support from voters in the typically Caucasian majority to elect the candidate of the minority group's choice. In apparent contradiction, the third *Gingles* precondition requires that the majority population vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51, 92 L. Ed. 2d at 47. Consequently, if the majority group does not vote sufficiently as a bloc, the third *Gingles* prong cannot be met. When a minority group is able to accumulate sufficient crossover Caucasian votes that the minority candidate is successful, however, the *Gingles* premise that the Caucasian majority votes *as a bloc* to defeat the minority group's candidate is undermined. *Metts*, 363 F.3d at 12 (recognizing the "tension" in "any effort to satisfy both the first and third prong of *Gingles*," and observing that "[t]o the extent that African-American voters have to rely on cross-over voting to prove they have the 'ability to elect' a candidate of their choosing, their argument that the majority votes as a bloc against their preferred candidate is undercut"). In short, a high level of crossover voting is inconsistent with the majority bloc voting defined in the third *Gingles* precondition and weakens the possibility of vote dilution. *See id.* at 13-14 (Selya, J., dissenting) (contending that a showing of majority bloc voting is "structurally inconsistent" with a crossover district).

Thus, after taking into account the language of *Gingles*, the weight of persuasive authority from the federal circuits, the importance of imposing a practicable rule, the necessity for judicial economy, the redistricting responsibility of the General Assembly, and the inherent tension lurking in the third *Gingles* prong, we conclude that a bright line rule is appropriate. Accordingly, if a minority group is geographically compact but nevertheless lacks a numerical majority of citizens of voting age, the minority group lacks the power to decide independently the outcome of an election, and its voting power has not been diluted by the lack of a legislative district. In such a case, the first *Gingles* precondition has not been satisfied and the General Assembly is not required to create a Section 2 legislative district.

As presently drawn, House District 18 does not meet this bright line test. The district has a total African-American population of 42.89

percent, and an African-American voting age population of 39.36 percent. Although the record does not reveal the number of voting-age African-Americans who are citizens, that number cannot exceed the total minority voting age population. Because the African-American minority group in House District 18 does not constitute a numerical majority of citizens of voting age, House District 18 does not meet the first *Gingles* precondition and its current configuration is not mandated by Section 2 of the VRA.

[3] As we noted at the beginning of this opinion, the formation of legislative districts must comport with the requirements of our State Constitution, unless federal law supercedes those provisions. Accordingly, because current House District 18 is not required by Section 2, it must comply with the redistricting principles enunciated by this Court in *Stephenson I*. The WCP forbids the division of a county in the formation of a legislative district, N.C. Const. art. II, §§ 3(3), 5(3), except to the extent the WCP conflicts with the VRA and "one-person, one-vote" principles, *Stephenson I*, 355 N.C. at 381, 562 S.E.2d at 396. The importance of counties in the redistricting process was discussed at length in *Stephenson I, id.* at 364-68, 562 S.E.2d at 385-88, in which we noted the "long-standing tradition of respecting county lines during the redistricting process in this State," *id.* at 366, 562 S.E.2d at 386. The U.S. Supreme Court acknowledges the importance of " 'traditional districting principles such as maintaining communities of interest and traditional boundaries' " in redistricting. *Abrams v. Johnson*, 521 U.S. 74, 92, 138 L. Ed. 2d 285, 303 (1997) (quoting *Bush v. Vera*, 517 U.S. 952, 977, 135 L. Ed. 2d 248, 269 (1996) (plurality)); *see also Stephenson I*, 355 N.C. at 381, 562 S.E.2d at 396 ("[O]peration of federal law does not preclude states from recognizing traditional political subdivisions when drawing their legislative districts."). Thus, the General Assembly must comply with the WCP to the "maximum extent possible," consistent with federal law. *Stephenson I*, 355 N.C. at 374, 562 S.E.2d at 391.

*Stephenson I* established nine requirements for a valid redistricting plan, several of which are relevant to House District 18:

[3.] In counties having a 2000 census population sufficient to support the formation of one non-VRA legislative district . . ., the WCP requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county.

[4.] When two or more non-VRA legislative districts may be created within a single county, . . . single-member non-VRA districts shall be formed within said county. Such non-VRA districts shall be compact and shall not traverse the exterior geographic boundary of any such county.

[5.] In counties having a non-VRA population pool which cannot support at least one legislative district . . . or, alternatively, counties having a non-VRA population pool which, if divided into districts, would not comply with the . . . "one-person, one-vote" standard, the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard. Within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the "exterior" line of the multi-county grouping; provided, however, that the resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard.

[6.] The intent underlying the WCP must be enforced to the maximum extent possible; thus, only the smallest number of counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard shall be combined[.]

[7.] . . . [C]ommunities of interest should be considered in the formation of compact and contiguous electoral districts.

*Stephenson II*, 357 N.C. at 306-07, 582 S.E.2d at 250 (emphasis omitted) (quoting and numbering the *Stephenson I* factors, 355 N.C. at 383-84, 562 S.E.2d at 396-98 (alterations in original)).

The General Assembly created House District 18, the only legislative district specifically at issue in this appeal, with the intention of complying with the requirements of Section 2 and thus with the belief that the district was exempt from the WCP and *Stephenson I* requirements. However, as explained above, the configuration of House District 18 is not required by Section 2, and thus the VRA neither controls the formation of that district nor supercedes our State

Constitution. Consequently, House District 18 must be drawn in accordance with the WCP and the *Stephenson I* requirements.

Pursuant to N.C.G.S. § 120-2.3 (2005), any judicial opinion which declares a redistricting plan "unconstitutional or otherwise invalid, in whole or in part and for any reason" must "identify every defect found by the court, both as to the plan as a whole and as to individual districts." Although the language of § 120-2.3 appears to be directed to trial courts that make findings of fact and conclusions of law, we acknowledge the General Assembly's need to know with specificity how a defective district fails to meet constitutional and statutory standards. Accordingly, we follow the statute's directive.

From the information provided by the parties in the record before us, it appears New Hanover County has a total population large enough to form two or more non-VRA legislative districts that need "not traverse the exterior geographic boundary" of the county, which would satisfy the fourth requirement of *Stephenson I*. *Stephenson I*, 355 N.C. at 383, 562 S.E.2d at 397. Pender County, in contrast, lacks sufficient population to support a non-VRA House district. Therefore, to comply with the fifth *Stephenson I* requirement, a voting district that includes Pender County must add population across a county line, but "only to the extent necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard." *Id.* at 384, 562 S.E.2d at 397. In following the sixth *Stephenson I* requirement, the districts within these counties must all comply with the WCP "to the maximum extent possible," and "only the smallest number of counties necessary to comply with the . . . 'one-person, one-vote' standard shall be combined." *Id.*

As a remedy, plaintiffs contend two House districts should be drawn in New Hanover County and one House district should be drawn comprising all of Pender County and a portion of New Hanover County. This Court declines, however, to specify the exact configuration of House District 18 or the configuration of House districts in Pender and New Hanover counties generally. "[R]edistricting is a legislative responsibility, [and] N.C.G.S. §§ 120-2.3 and 120-2.4 give the General Assembly a first, limited opportunity to correct plans that the courts have determined are flawed." *Stephenson v. Bartlett*, 358 N.C. 219, 230, 595 S.E.2d 112, 119 (2004) (*Stephenson III*). "Not only do these statutes allow the General Assembly to exercise its proper responsibilities, they decrease the risk that the courts will encroach upon the responsibilities of the legislative branch." *Id.*

Although we leave to the General Assembly the drawing of either House District 18 or the surrounding districts in Pender, New Hanover, and other counties in the vicinity, we direct that all redistricting plans for the North Carolina House of Representatives and North Carolina Senate comply with the principal holding of this case: in order for a minority group to satisfy the first *Gingles* precondition and be "sufficiently large and geographically compact to constitute a majority in a single-member district," 478 U.S. at 50, 92 L. Ed. 2d at 46, it must constitute a numerical majority of citizens of voting age. Any legislative district designated as a Section 2 district under the current redistricting plans, and any future plans, must either satisfy the numerical majority requirement as defined herein, or be redrawn in compliance with the Whole County Provision of the Constitution of North Carolina and with *Stephenson I* requirements.

Since House District 18 fails to comply with the WCP and *Stephenson I* requirements, it must be redrawn. We leave to the General Assembly the decision whether House District 18 should be redrawn as a non-VRA district, or whether it should be redrawn to meet the numerical majority requirement to satisfy the first *Gingles* precondition.

[4] We are cognizant that the General Assembly will need time to redistrict not only House District 18 but also other legislative districts directly and indirectly affected by this opinion. The North Carolina General Assembly is now in recess and is not scheduled to reconvene until 13 May 2008, after the closing of the period for filing for elective office in 2008. We also realize that candidates have been preparing for the 2008 election in reliance upon the districts as presently drawn. Accordingly, to minimize disruption to the ongoing election cycle, the remedy explained above shall be stayed until after the 2008 election. *See Reynolds v. Sims*, 377 U.S. 533, 585, 12 L. Ed. 2d 506, 551 (1964) ("In awarding or withholding immediate relief [in an apportionment case], a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree."). At the conclusion of the 2008 election, House District 18 and other impacted districts must be redrawn. All redistricting performed thereafter shall comply with this opinion.

REVERSED.

Justice HUDSON did not participate in the consideration or decision of this case.

Chief Justice PARKER dissenting.

I respectfully dissent. In my view the General Assembly had a sound legal basis for concluding that the configuration of North Carolina House District 18 in the 2003 House Plan was necessary to comply with Section 2 of the Voting Rights Act. Accordingly, for the reasons discussed herein, I would affirm the decision of the three-judge panel upholding the division of Pender County.

Article II, Section 3, Clause 3 and Section 5, Clause 3 of the North Carolina Constitution, collectively referred to as the "Whole County Provisions" (the WCP), provide that "[n]o county shall be divided" in the formation of senate and representative districts. In *Stephenson I* and *Stephenson II*, this Court established legal principles, including application of the Whole County Provisions, under which the legislature's redistricting authority is exercised; however, the Court deferred to the Supremacy Clauses of both the State and Federal Constitutions for purposes of applying the WCP. *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002) (*Stephenson I*); *Stephenson v. Bartlett*, 357 N.C. 301, 582 S.E.2d 247 (2003) (*Stephenson II*). This Court explained the supremacy of federal law as follows:

> We recognize that, like the application or exercise of most constitutional rights, the right of the people of this State to legislative districts which do not divide counties is not absolute. In reality, an inflexible application of the WCP is no longer attainable because of the operation of the provisions of the VRA and the federal "one-person, one-vote" standard, as incorporated within the State Constitution. This does not mean, however, that the WCP is rendered a legal nullity if its beneficial purposes can be preserved consistent with federal law and reconciled with other state constitutional guarantees.

*Stephenson I*, 355 N.C. at 371, 562 S.E.2d at 389 (internal citations omitted). Throughout its opinion, this Court repeatedly noted that the WCP must yield to provisions of the Voting Rights Act prohibiting the dilution of minority voting strength. "[T]he State retains significant discretion when formulating legislative districts, so long as the

'effect' of districts created pursuant to a 'whole-county' criterion or other constitutional requirement does not dilute minority voting strength in violation of federal law." *Id.* at 370, 562 S.E.2d at 389. "Although no federal law has preempted this Court's authority to interpret the WCP as it applies statewide, we acknowledge that complete compliance with federal law is the first priority before enforcing the WCP." *Id.* at 374 n.4, 562 S.E.2d at 391 n.4.

Finally, this Court established nine criteria to be followed by the General Assembly in drawing legislative districts. The first criterion expressly requires drawing districts that comply with the provisions of the Voting Rights Act:

> [T]o ensure full compliance with federal law, legislative districts required by the VRA shall be formed prior to creation of non-VRA districts. . . . In the formation of VRA districts within the revised redistricting plans on remand, we likewise direct the trial court to ensure that VRA districts are formed consistent with federal law and in a manner having no retrogressive effect upon minority voters. To the maximum extent practicable, such VRA districts shall also comply with the legal requirements of the WCP.

*Stephenson II*, 357 N.C. at 305, 582 S.E.2d at 250 (alterations in original) (emphasis omitted) (citing *Stephenson I*, 355 N.C. at 383, 562 S.E.2d at 396-97).

Section 2 of the Voting Rights Act forbids any "voting qualification or prerequisite to voting or standard, practice or procedure . . . which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a) (2000). A State is in violation of Section 2

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 1973(b) (2000).

In construing the totality of circumstances test, the United States Supreme Court in *Gingles* relied upon the Senate Report accompany-

ing the 1982 VRA Amendments, stating, "the Committee determined that the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Thornburg v. Gingles*, 478 U.S. 30, 45, 92 L. Ed. 2d 25, 43 (1986) (quoting S. Rep. No. 97-417, at 30 (1982) (citations, internal quotation marks, and footnotes omitted)). In providing structure to the totality of circumstances inquiry, the Court in *Gingles* enumerated three threshold factors for establishing vote dilution as follows:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.

*Id.* at 50-51, 92 L. Ed. 2d at 46-47 (internal citations and footnote omitted).

With respect to whether a minority group is sufficiently large to "constitute a majority," the Court in *Gingles* disclaimed mechanical application of the first precondition by stating:

> We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability to *influence* elections.

*Id.* at 46 n.12, 92 L. Ed. 2d at 44 n.12. Thus, the Court declined to address whether the first threshold requirement could extend to a group that constitutes a sufficiently large minority to elect the candidate of its choice with the assistance of limited, yet predictable, crossover votes from the white majority.

In her concurring opinion, Justice O'Connor rejected the distinction between a Section 2 claim in which the minority constitutes a numerical majority in a district and a Section 2 claim when the minority group, though not a majority in the proposed district, has the ability to elect its candidate of choice with the assistance of limited crossover support from white voters, stating:

I note, however, the artificiality of the Court's distinction between claims that a minority group's "ability *to elect* the representatives of [its] choice" has been impaired and claims that "its ability to *influence* elections" has been impaired. *Ante*, at 46-47, n.12. . . . [T]he Court recognizes that when the candidates preferred by a minority group are elected in a multimember district, the minority group has *elected* those candidates, even if white support was indispensable to these victories. On the same reasoning, if a minority group that is not large enough to constitute a voting majority in a single-member district can show that white support would probably be forthcoming in some such district to an extent that would enable the election of the candidates its members prefer, that minority group would appear to have demonstrated that, at least under this measure of its voting strength, it would be able to elect some candidates of its choice.

*Id.* at 90 n.1, 92 L. Ed. 2d at 72 n.1 (O'Connor, J., Burger, C.J., Powell & Rehnquist, JJ., concurring in the judgment).

In subsequent cases, the United States Supreme Court has not endorsed a bright line requirement that a minority group seeking Section 2 VRA relief constitute a numerical majority. In fact, despite having the opportunity to do so, the Court has repeatedly declined to close the door on the issue. *See Johnson v. De Grandy*, 512 U.S. 997, 1008-09, 129 L. Ed. 2d 775, 789-90 (1994) (in which the Court declined to hold that plaintiffs could not make a VRA claim based on influence districts); *Voinovich v. Quilter*, 507 U.S. 146, 154, 122 L. Ed. 2d 500, 511 (1993) (in which the Court declined to address whether a reapportionment commission's failure to create influence districts resulted in a Section 2 violation); *Growe v. Emison*, 507 U.S. 25, 41 & n.5, 122 L. Ed. 2d 388, 404 & n.5 (1993) (in which the Court declined to decide if plaintiffs could argue influence dilution in addition to vote dilution when the *Gingles* test was not satisfied).

Moreover, the Supreme Court has continued to caution lower courts against applying *Gingles* to impose a rigid numerical majority requirement. In *Voinovich*, the Supreme Court explained that the *Gingles* factors "cannot be applied mechanically and without regard to the nature of the claim." 507 U.S. at 158, 122 L. Ed. 2d at 514. Justice O'Connor noted that the first *Gingles* requirement would have to be "modified or eliminated" when the Court considered cases in which black voters are denied "the possibility of being a sufficiently

large *minority* to elect their candidate of choice with the assistance of cross-over votes from the white majority." *Id.*

Recently, in *League of United Latin American Citizens v. Perry*, —— U.S. ——, 165 L. Ed. 2d 609 (2006), the Supreme Court was confronted with the issue presented in this case. In the plurality opinion of Justice Kennedy, Part IV addressed the first *Gingles* threshold condition by assuming, as the Court had done in the past, that it is possible for a minority group that makes up less than fifty percent of the district's population to state a claim under Section 2. *Id.* at ——, 165 L. Ed. 2d at 647 (plurality). Justice Kennedy concluded that under this assumption, the racial minority "must show they constitute a sufficiently large minority to elect their candidate of choice with the assistance of cross-over votes." *Id.* at ——, 165 L. Ed. 2d at 647 (plurality) (quoting *Voinovich*, 507 U.S. at 158, 122 L. Ed. 2d at 515 (emphasis and internal quotation marks omitted)). Although the Court concluded that no Section 2 violation occurred, the Court did so based on its determination that the evidence did not show that black voters could elect a candidate of their choice, even with crossover voting.

Justice Souter, in a separate opinion joined by Justice Ginsberg, dissented from Part IV, in which the plurality upheld the trial court's ruling that no Section 2 violation of the VRA occurred. *Id.* at ——, 165 L. Ed. 2d at 672 (Souter & Ginsburg, JJ., concurring in Parts II-A, II-D, III, and dissenting from Part IV). Justice Souter concluded that "[a]lthough both the plurality today and our own prior cases have sidestepped the question whether a statutory dilution claim can prevail without the possibility of a district percentage of minority voters above 50%, the day has come to answer it." *Id.* at ——, 165 L. Ed. 2d at 672-73 (Souter and Ginsburg, JJ., dissenting) (internal citations omitted). Justice Souter would have returned the Section 2 VRA claim to the district court for reconsideration "untethered by the 50% barrier." *Id.* at ——, 165 L. Ed. 2d at 677 (Souter & Ginsburg, JJ., dissenting). Justice Stevens, in his dissenting opinion, stated, "I agree with Justice Souter that the '50% rule,' which finds no support in the text, history, or purposes of § 2, is not a proper part of the statutory vote dilution inquiry." *Id.* at —— n.16, 165 L. Ed. 2d at 670 n.16 (Stevens, J., dissenting).

Although the Supreme Court has repeatedly left open the issue, several lower federal courts, as noted by the majority, have ruled that a numerical majority is necessary to establish a Section 2 claim. *See,*

*e.g.*, *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004), *cert. denied*, 544 U.S. 961, 161 L. Ed. 2d 602 (2005) *and Rodriguez v. Pataki*, 308 F. Supp. 2d 346 (S.D.N.Y.) (per curiam), *aff'd mem.*, 543 U.S. 997, 160 L. Ed. 2d 454 (2004).

In *Hall*, the plaintiffs contended that a redistricting plan which reduced the black voting age population of a district from 37.8% to 32.3% violated Section 2 of the VRA because, under the newly drawn Fourth Congressional District, blacks were too small in number to form the same winning coalition with crossover white voters that existed before enactment of the plan. By requiring a literal numerical majority, the *Hall* court did not determine whether, prior to the new redistricting plans, blacks in the district had the ability to elect a candidate of choice with the support of limited crossover votes. Stated differently, the court did not determine whether a 37.8% black voting age population constituted a sufficiently large minority presence in the district to allow minority voters the ability to elect their candidate of choice with a small, but predictable, number of crossover votes, and consequently, whether reducing the minority presence in the district to 32.3% would cause blacks to lose the ability to elect a candidate by making successful coalition voting impossible.

In *Rodriguez v. Pataki*, the court opined that "[e]ven if the first *Gingles* factor were applied flexibly to accommodate crossover or 'ability to elect' districts, the plaintiffs would have to prove that their proposed district would provide blacks with the ability to elect candidates of choice." 308 F. Supp. 2d at 403 (citation omitted). Although the *Rodriguez* court stated its preference for a bright-line rule, it denied the plaintiffs' ability to elect claim not because the black population in the district was less than fifty percent, but because the plaintiffs did not present sufficient evidence that blacks would have the ability to elect candidates of their choice. *Id.* at 403.

North Carolina courts are not bound by decisions of the Fourth Circuit or any other lower federal court, but only by a decision of the United States Supreme Court. *See State v. McDowell*, 310 N.C. 61, 74, 310 S.E.2d 301, 310 (1984), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 732 (1986).

In North Carolina's legislative elections, a clear pattern exists which demonstrates the level of minority presence necessary to give minority voters an opportunity to elect their preferred candidates. Prior voting patterns reveal that house districts in North Carolina having total black population percentages of 41.54% and above and

black voting age population percentages of 38.37% and above provide an effective opportunity to elect black candidates. The record shows that the General Assembly considered the most relevant indicator of black voting strength to be black Democratic voter registration; districts where such registration exceeds fifty percent consistently elect black representatives.

In this case, the minority concentration in House District 18 in the 2003 Plan consisted of a total black population of 42.89%, a black voting age population of 39.36%, and a black Democratic voter registration of 53.72%. In House District 18, election results have already established that minority voters have the potential to elect a representative of choice.[3] The 2004 election results, held under the 2003 plan, demonstrated that District 18 as currently drawn is an effective minority voting district in which the minority voters' preferred candidate was re-elected. Unquestionably, a black candidate can be elected in House District 18, notwithstanding that the number of minority voters in the district is less than fifty percent.

Altering the district to further reduce the minority population would result in dilution of a distinctive minority vote. In *Hall*, the court found that a minority group's voting strength is measured in terms of the group's "ability to elect candidates to public office." 385 F.3d at 427. However, minority voters who do not form a numerical majority in a district but who can elect their candidate of choice with a limited number of crossover votes do, indeed, have the "ability to elect." Taking this predictable measure away from minorities leaves them with "less opportunity than other members of the electorate . . . to elect representatives of their choice." 42 U.S.C. § 1973(b).

The three-judge panel reviewed the existing law and correctly declined to follow a rigid test requiring an absolute numerical majority of minority voters in a single-member district. The panel instead took a functional approach and found that the proper factual inquiry in analyzing a "coalition" or an "ability to elect district" is not whether black voters make up the numerical majority of voters in a single-member district, but whether "the political realities of the district, such as the political affiliation and number of black registered voters

---

3. District 18 can be described as an "ability to elect" or "crossover" district. An "ability to elect district" is a district where members of the minority group are not a majority of the voting population, but have the ability to elect representatives of their choice with support from a limited, but reliable, white crossover vote. *Rodriguez v. Pataki*, 308 F. Supp. 2d at 376 (citation omitted).

when combined with other relevant factors" operate to allow black voters to elect their candidate of choice. Such an inquiry must focus on the potential of black voters to elect their preferred candidates, not merely on raw numbers alone.

Recent United States Supreme Court opinions suggest that the application of a numerical majority requirement without respect to attendant political circumstances is not the appropriate test of the merits of a Section 2 Voting Rights Act claim. Nowhere in the language of Section 2 is there a requirement that a district must include a population of more than fifty percent of minority voters in order for a petitioner to state a claim for relief under Section 2. Rather, the "totality of circumstances" language mandates a flexible standard based on political realities of the district and supports creation of a district in which the minority group has the ability to elect a representative of choice with crossover support from voters of other racial or ethnic groups.

Under this Court's prior rulings, the General Assembly must meet the requirements of federal law before adhering to the Whole County Provisions in Article II, Section 3, Clause 3 and Section 5, Clause 3 of the North Carolina Constitution. *See Stephenson I*, 355 N.C. at 381-82, 562 S.E.2d at 396-97. In drawing House District 18 in Pender and New Hanover Counties, the General Assembly sought to maintain an effective minority district to comply with Section 2 of the VRA and to comply with the WCP to the maximum extent possible. Following the principles this Court established in the *Stephenson v. Bartlett* cases, the three-judge panel properly concluded that no county, including Pender County, is guaranteed protection from being divided based on the WCP of our State Constitution when the division of counties is necessary to comply with the Voting Rights Act.

House District 18, as presently drawn, contains a black voting age population that is "sufficiently large and geographically compact" to elect its candidate of choice, *Gingles*, 478 U.S. at 50, 92 L. Ed. 2d at 46, and the General Assembly drew House District 18 to comply with the North Carolina Constitution to the maximum extent possible.

For the foregoing reasons, I would vote to affirm the decision of the three-judge panel.

Justice TIMMONS-GOODSON joins in this dissenting opinion.

Justice TIMMONS-GOODSON dissenting.

I join the Chief Justice's dissent. Furthermore, I write separately to express my concern that in overriding our legislature's decisions in order to impose a bright-line rule, the majority has given insufficient deference to the legislature's considered judgment. As the Supreme Court of the United States has stated, "The function of the legislature is primary, its exercises fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of their wisdom or propriety." *Weems v. United States*, 217 U.S. 349, 379, 30 S. Ct. 544, 554, 54 L. Ed. 793, 803 (1910). " '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.' " *Gregg v. Georgia*, 428 U.S. 153, 175-76, 96 S. Ct. 2909, 2926, 49 L. Ed. 2d 859, 876 (1976) (judgment of the court and opinion of Stewart, Powell & Stevens, JJ.) (alteration in original) (quoting *Furman v. Georgia*, 408 U.S. 238, 383, 92 S. Ct. 2726, 2800-01, 33 L. Ed. 2d 346, 432, (1972) (Burger, C. J., Blackmun, Powell & Rehnquist, JJ., dissenting)).

Since the majority's calculus does not appear to appropriately factor in the legislature's role in the districting process, and the deference due it, I respectfully dissent.