Justice BEASLEY,
concurring in part and dissenting in part.
I agree with the judgment of the Court as to plaintiffs’ challenge under the “Good of the Whole” Clause in Article I, Section 2 of the North Carolina Constitution; however, because I would conclude that the parties and the jurisprudence of this State would be better served by vacating the trial court’s Judgment and remanding this case to the trial court for more complete findings of fact consistent with the guidance provided in Alabama Legislative Black Caucus v. Alabama, I respectfully dissent.
The order of the United States Supreme Court (the Supreme Court) vacating and remanding this Court’s judgment in Dickson v. Rucho, 367 N.C. 542, 766 S.E.2d 238 (2014), directed this Court to reconsider the case in light of Alabama Legislative Black Caucus v. Alabama, 575 U.S. _, 135 S. Ct. 1257, 191 L. Ed. 2d 314 (2015) (ALBC). See Dickson v. Rucho, 575 U.S. _, 135 S. Ct. 1843, 191 L. Ed. 2d 719 (2015). The majority reads ALBC so narrowly that its implications for the case before this Court are negligible at best. In my view, if the Supreme Court saw fit to vacate and remand the previous judgment for reconsideration *535 in light of ALBC, this Court would do well to give credence to the legal principles imparted in that decision.[1]
To that end, I am of the opinion that ALBC bolsters all the points made in my previous dissent, particularly with respect to the General Assembly’s use of proportionality as a benchmark, and provides authoritative guidance on how the trial court should have viewed the record of evidence before it. I stand by everything espoused in that dissent, and for that reason, portions of my previous dissent appear in this opinion.
The ALBC plaintiffs, like plaintiffs here, contended that their state legislature’s enacted redistricting plans constituted racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment. ALBC, 575 U.S. at _, 135 S. Ct. at 1262, 191 L. Ed. 2d at 323. Alabama defended its enacted plans by arguing that the plans reflected its goals of coming close to a one-person, one-vote ideal, with no more than a 1% deviation from that ideal, and avoiding retrogression under § 5 of the Voting Rights Act of 1965.[2] Id. at _, 135 S. Ct. at 1263, 191 L. Ed. 2d at 324. The federal district court held that the plaintiffs “had failed to prove their racial gerrymandering claims.” Id. at _, 135 S. Ct. at 1264, 191 L. Ed. 2d at 325. The Supreme Court vacated the district court’s judgment, citing errors in the district court’s application and interpretation of the pertinent law. Id. at _, 135 S. Ct. at 1264, 191 L. Ed. 2d at 325-26. Although the arguments made by the parties in ALBC are somewhat different from the arguments made by the parties here, ALBC illuminates errors in the trial court’s analysis of plaintiffs’ racial gerrymandering claims in this case, and as stated above, provides guidance *536 on how the trial court should approach the analysis on remand. This Court’s majority does not give the trial court the opportunity to get it right and fails to require the trial court to make conclusions of law resting on adequate findings of fact that reflect a correct application of the law. I cannot agree with this decision.
I.
“Classifications of citizens solely on the basis of race ‘are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.’” Shaw v. Reno, 509 U.S. 630, 643, 113 S. Ct. 2816, 2824, 125 L. Ed. 2d 511, 526 (1993) (Shaw I) (quoting Hirabayashi v. United States, 320 U.S. 81, 100, 63 S. Ct. 1375, 1385, 87 L. Ed. 1774, 1786 (1943)). “One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities.” Rice v. Cayetano, 528 U.S. 495, 517, 120 S. Ct. 1044, 1057, 145 L. Ed. 2d 1007, 1026 (2000). “Furthermore, ‘[i]tis axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree.’ These principles apply to the drawing of electoral and political boundaries.” Johnson v. De Grandy, 512 U.S. 997, 1029-30, 114 S. Ct. 2647, 2666, 129 L. Ed. 2d 775, 802 (1994) (Kennedy, J., concurring in part and. concurring in the judgment) (alteration in original) (internal citations omitted) (quoting Powers v. Ohio, 499 U.S. 400, 410, 111 S. Ct. 1364, 1370, 113 L. Ed. 2d 411, 425 (1991)). Accordingly, the Supreme Court has held that “the Fourteenth Amendment requires state legislation that expressly distinguishes among citizens because of their race to be narrowly tailored to further a compelling governmental interest.” Shaw I, 509 U.S. at 643, 113 S. Ct. at 2825, 125 L. Ed. 2d at 526 (citations omitted). “Applying traditional equal protection principles in the voting-rights context is ‘a most delicate task’. . . because a legislature may be conscious of the voters’ races without using race as a basis for assigning voters to districts.” Shaw v. Hunt, 517 U.S. 899, 905, 116 S. Ct. 1894, 1900, 135 L. Ed. 2d 207, 218 (1996) (Shaw IT) (quoting Miller v. Johnson, 515 U.S. 900, 905, 115 S. Ct. 2475, 2483, 132 L. Ed. 2d 762, 772 (1995)). Therefore, race must be “the predominant factor motivating the legislature’s decision” in order to trigger strict scrutiny. Miller, 515 U.S. at 916, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779.
The burden to make this showing falls to the plaintiff:
The plaintiff’s burden is to show, either through circumstantial evidence of a district’s shape and demographics or more direct evidence going to legislative purpose, that *537 race was the predominant factor motivating the legislature’s decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.
Id. at 916, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779-80.
If the plaintiff satisfies this initial burden of production,[3] the redistricting legislation “cannot be upheld unless it satisfies strict scrutiny, [the] most rigorous and exacting standard of constitutional review.” Id. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782. Once strict scrutiny review is triggered, the burden shifts to the State to “show not. only that its redistricting plan was in pursuit of a compelling state interest, but also that ‘its districting legislation is narrowly tailored to achieve [that] compelling interest.’ ” Shaw II, 517 U.S. at 908, 116 S. Ct. at 1902, 135 L. Ed. 2d at 220-21 (alteration in original) (quoting Miller, 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782).
a.
In my earlier dissent, I questioned this Court’s handling of the apparent deficiencies in the trial court’s findings of fact with respect to whether race was the predominant motivating factor for the General Assembly in the creation of the twenty-six VRA districts. See Dickson v. Rucho, 367 N.C. 542, 578-79, 766 S.E.2d 238, 262-63 (2014) (Beasley, J., concurring in part and dissenting in part). The trial court found that
[t]he Plaintiffs collectively challenge as racial gerrymanders 9 Senate, 18 House and 3 U.S. Congressional districts created by the General Assembly in the Enacted Plans. Of those 30 challenged districts, it is undisputed that the General Assembly intended to create 26 of the challenged districts to be “Voting Rights Act districts” [hereinafter *538 “VRA districts”] and that it set about to draw each of these VRA districts so as to include at least 50% Total Black Voting Age Population [hereinafter “TBVAP”]. Moreover, the General Assembly acknowledges that it intended to create as many VRA districts as needed to achieve a “roughly proportionate” number of Senate, House and Congressional districts as compared to the Black population in North Carolina. To draw districts based upon these criteria necessarily requires the drafters of districts to classify residents by race so as to include a sufficient number of black voters inside such districts, and consequently exclude white voters from the districts, in an effort to achieve a desired racial composition of >50% TBVAP and the desired “rough proportionality.” This is a racial classification.
(Footnote call numbers omitted.) Accordingly, the trial court “conclude[d] . . . that in drawing [the] VRA districts ...[,] the shape, location and racial composition of each VRA district was predominantly determined by a racial objective and was the result of a racial classification sufficient to trigger the application of strict scrutiny as a matter of law.”
On remand, this Court holds, just as it did before, that the trial court’s finding that “no factual inquiry was required regarding the General Assembly’s predominant motivation in forming the twenty-six VRA districts beyond the General Assembly’s concession that the districts were drafted to be VRA-compliant” was insufficient to show “whether race fairly can be described as the predominant factor.” The majority then proceeds under the assumption that race was the predominant motivating factor and, accordingly, embarks on a strict scrutiny analysis. I maintain that, instead of perpetuating the trial court’s mistake in making “truncated findings of fact,” this Court should remand this case to the trial court to correct the deficiency because the citizens of this state would be better served if we held to our usual course and vacated the trial court’s Judgment and remanded the case to the trial court for proper findings of fact and conclusions of law based upon a correct interpretation of the law. When viewed in fight of the guidance provided mALBC, the deficiencies in the trial court’s findings with respect to predominance and the error of this Court in ignoring the same are clear.
One of the Alabama legislature’s goals in developing its redistricting plan was to come as close as possible to the ideal one-person, one-vote population with a deviation of no more than 1%. ALBC, 575 U.S. *539 at _, 135 S. Ct. at 1263, 191 L. Ed. 2d at 324. In other words, Alabama endeavored to create districts of approximately equal population. The district court concluded that race was not a predominant motivating factor because, on balance, the plans reflected nonracial motivations, such as an attempt to equalize population. Id. at _, 135 S. Ct. at 1270, 191 L. Ed. 2d at 331. The Supreme Court took issue with the district court’s “calcula![ion]” of predominance, reasoning that “an equal population goal is not one factor among others to be weighed against the use of race to determine whether race ‘predominates.’ Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator’s determination as to how equal population objectives will be met.” Id. at _, 135 S. Ct. at 1270, 191 L. Ed. 2d at 332. Further, the Supreme Court explained that predominance has a special meaning in the context of racial gerrymandering claims because “[i]t is not about whether a legislature believes that the need for equal population takes ultimate priority. Rather, it is, as we said, whether the legislature placed race above traditional districting considerations in determining which persons were placed in appropriately apportioned districts.” Id. at _, 135 S. Ct. at 1271, 191 L. Ed. 2d at 332 (citation, emphasis, and quotation marks omitted). The Supreme Court noted that, if the district court had applied the predominance test correctly, its conclusions may have been different, id. at _, 135 S. Ct. at 1271, 191 L. Ed. 2d at 333, and, hence reconsideration on remand was appropriate.
While the precise issue identified in ALBC is not present in the case before us, the takeaway is relevant: the predominance test — whether “the legislature subordinated traditional race-neutral districting principles ... to racial considerations,” Miller, 515 U.S. at 916, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779-80—must be applied correctly. The lower court in ALBC balanced race against traditional redistricting principles, but improperly included equal population as a traditional principle, and the Supreme Court took exception to the court’s misapplication of the law. Here the trial court skipped the balancing of race against traditional redistricting principles entirely and instead concluded that it could “bypass this factual inquiry” for the twenty-six VRA districts. The Supreme Court acknowledged that a misapplication of the law can lead to erroneous conclusions and, therefore, remand under those circumstances is necessary to ensure proper application. Remand is also necessary here. But, as I noted in my previous dissent, there is ample evidence that the General Assembly subordinated traditional redistricting principles to racial considerations, and thus, the record contains sufficient evidence to support a predominance finding.
*540 Plaintiffs and amici point to evidence showing that State Senator Robert Rucho and State Representative David Lewis, the respective chairs of the Senate and House Redistricting Committees, instructed Dr. Thomas Brooks Hofeller, the “chief architect” of the redistricting plans, to draw the plans to provide “substantial proportionality]” between the percentage of the state’s population that is Black and the percentage of districts that would be majority-Black. Dr. Hofeller was also told to “draw a 50% plus one district wherever in the state there is a sufficiently compact black population” to do so. The public statements released by Senator Rucho and Representative Lewis also reflect these legislative goals, saying that, in order to comply with VRA § 2, the VRA districts are designed to provide Black voters with “substantial proportionality” and “must be established with a BVAP of 50% plus one.” Because the Supreme Court has held that similar evidence demonstrated that race was the predominant motivating factor, the trial court would have ample justification for determining that strict scrutiny is the appropriate level of review to apply to the Enacted Plans.[4]
Assuming that the trial court makes a proper predominance finding on remand, the trial court must properly apply the strict scrutiny standard. In its decision the trial court states that, if plaintiffs meet the threshold burden of establishing that “race was the overriding consideration behind a redistricting plan,” then
the state . . . has the burden of “producing evidence that the plan’s use of race is narrowly tailored to further a compelling state interest, and the plaintiffs bear the ultimate burden of persuading the court either that the proffered justification is not compelling or that the plan is not narrowly tailored to further it.” Shaw v. Hunt, 861 F. Supp. 408, 436 (E.D.N.C. 1994).
*541 In support of this proposition, the trial court quotes the district court’s decision in Shaw II. In Shaw II, however, the Supreme Court reversed the trial court and, in doing so, held that under strict scrutiny, “North Carolina... must show not only that its redistricting plan was in pursuit of a compelling state interest, but also that ‘its districting legislation is narrowly tailored to achieve [that] compelling interest.’ ” Shaw II, 517 U.S. at 908, 116 S. Ct. at 1902, 135 L. Ed. 2d at 220-21 (alteration in original) (emphasis added) (quoting Miller, 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d 782). This language from Shaw II clearly places the burden of proof on the State once strict scrutiny is triggered.
This conclusion is bolstered by the Supreme Court’s earlier statement in Miller that, “[t]o satisfy strict scrutiny, the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.” 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782 (emphasis added) (citations omitted). More recently, in the affirmative action context, the Supreme Court has been more explicit on this point: Under strict scrutiny, “it remains at all times the [government]’s obligation to demonstrate, and the Judiciary’s obligation to determine,” that the challenged action is narrowly tailored to achieve a compelling governmental interest. Fisher v. Univ. of Tex. at Austin, _ U.S. _, _, 133 S. Ct. 2411, 2420, 186 L. Ed. 2d 474, 486-87 (2013) (emphasis added).
Here, the trial court attempted to distinguish Fisher on the ground that the General Assembly is entitled to some degree of deference given that redistricting is “an inherently political process.” The Supreme Court, however, has declined to defer to political decision makers and apply something less than strict scrutiny to race-based classifications:
But we have refused to defer to state officials’ judgments on race in... areas where those officials traditionally exercise substantial discretion. For example,.... in the redistricting context, despite the traditional deference given to States when they design their electoral districts, we have subjected redistricting plans to strict scrutiny when States draw district lines based predominantly on race.
Johnson v. California, 543 U.S. 499, 512, 125 S. Ct. 1141, 1150, 160 L. Ed. 2d 949, 962-63 (2005) (citations omitted); accord Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 744, 127 S. Ct. 2738, 2766, 168 L. Ed. 2d 508, 539 (2007) (plurality) (explaining that “deference is fundamentally at odds with our equal protection jurisprudence” and that courts “put the burden on State actors to demonstrate that their *542 race-based policies are justified” (citations and quotation marks omitted)). Moreover, to whatever extent the legislature may be entitled to deference, that “limited degree of leeway in furthering [its] interests” in complying with the VRA relates to whether the state has met its burden of establishing “the ‘narrow tailoring’ requirement of strict scrutiny.” Bush v. Vera, 517 U.S. 952, 977, 116 S. Ct. 1941, 1960, 135 L. Ed. 2d 248, 268 (1996) (plurality). Nonetheless, this deference does not relieve the State of “the burden to prove ‘that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate.’ ” Fisher, _ U.S. at _, 133 S. Ct. at 2419, 186 L. Ed. 2d at 485 (alterations in original) (emphasis added) (quoting City of Richmond v. J.A. Croson Co., 488 U.S. 469, 505, 109 S. Ct. 706, 728, 102 L. Ed. 2d 854, 889 (1989)).
Even though the evidence, in my view, provides ample justification for the conclusion made by the trial court — that race predominated — it is important that the trial court do the work, as required by Miller and now ALBC, and properly determine whether the General Assembly subordinated traditional redistricting principles to racial considerations. Moreover, the trial court’s misunderstanding and misapplication of the strict scrutiny analytical framework provides additional justification for a decision to vacate the trial court’s decision and remand this case to the trial court for reconsideration in light of correct principles. See Fisher, id. at _, 133 S. Ct. at 2421-22, 186 L. Ed. 2d at 487-89 (remanding after determining the trial court and court of appeals misapplied strict scrutiny standard so that challenged admissions policy could be “considered and judged under a correct analysis”). Failure to apply properly the operative constitutional test is, in itself, a sufficient basis for overturning the trial court’s decision. See id. at _, 133 S. Ct. at 2421-22, 186 L. Ed. 2d at 487-89. This Court should not forgive the misapplication of the law because, as the Court in ALBC confirmed, a misapplication of the law upon which a conclusion depends, infects the remainder of the analysis.
b.
After the trial court concluded that race predominated in the General Assembly’s decision to create twenty-six VRA districts and that strict scrutiny applied, the trial court also side-stepped its compelling state interest analysis with respect to § 2. Specifically, the trial court’s findings were insufficient as they relate to determining whether the challenged districts met all three Gingles preconditions. The trial court concluded “that the General Assembly had a strong basis in evidence to conclude that each of the Gingles preconditions was present in substantial portions of North Carolina and that, based upon the totality of circumstances, VRA districts were required to remedy against vote dilution.”
*543 At the outset, the trial court’s conceptualization of the Gingles preconditions analysis was faulty. The ALBC opinion explains that “[a] racial gerrymandering claim, however, applies to the boundaries of individual districts. It applies district-by-district. It does not apply to a State considered as an undifferentiated ‘whole.’ ” ALBC, 575 U.S. at _, 135 S. Ct. at 1265, 191 L. Ed. 2d at 326. The trial court’s conclusion that the preconditions were present “in substantial portions of North Carolina” suggests that the trial court did not engage in a district-by-district analysis as required by law. The trial court must make findings of fact addressing the presence of each of the Gingles preconditions in each of the challenged districts.
Moreover, the trial court’s findings of fact in the Judgment and Memorandum of Decision and in Appendix A of the Judgment related to the third precondition are deficient. In Thornburg v. Gingles the Supreme Court held that, in order to establish a § 2 voting dilution claim, the minority group must demonstrate that (1) “it is sufficiently large and geographically compact to constitute a majority in a single-member district”; (2) “it is politically cohesive”; and (3) “the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority’s preferred candidate.” Thornburg v. Gingles, 478 U.S. 30, 50-51, 106 S. Ct. 2752, 2766-67, 92 L. Ed. 2d 25, 46-47 (1986) (citations omitted); see De Grandy, 512 U.S. at 1006, 114 S. Ct. at 2654, 129 L. Ed. 2d at 788 (majority) (confirming that vote dilution in the case of single-member districts likewise requires proof of the three preconditions (citing Growe v. Emison, 507 U.S. 25, 40-41, 113 S. Ct. 1075, 1084, 122 L. Ed. 2d 388, 403-04 (1993))). Furthermore, when defendants use § 2 as a defense against claims that redistricting plans are unconstitutional, defendants bear the burden of demonstrating the existence of all three mandatory preconditions. Pender County v. Bartlett, 361 N.C. 491, 496, 649 S.E.2d 364, 367 (2007) (Pender County), aff'd sub nom. Bartlett v. Strickland, 556 U.S. 1, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009) (Strickland) (plurality).
The trial court summarized the evidence relevant to the three preconditions that was before the General Assembly when it enacted the plans. Most of the evidence related to the existence of racially polarized voting in North Carolina. To a certain extent, explaining the evidence of racial polarization was appropriate because, in Gingles the Supreme Court explained:
The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc *544 usually to defeat the minority’s preferred candidates. . . . A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white “crossover" votes rises to the level of legally significant white bloc voting.
Gingles, 478 U.S. at 56, 106 S. Ct. at 2769, 92 L. Ed. 2d at 50 (emphasis added) (citations omitted). The trial court found as fact that experts and community members had concluded that racially polarized voting exists in the challenged districts. Yet, neither the Judgment and Memorandum of Decision nor Appendix A to the Judgment makes a finding as to whether the majority usually bloc votes to defeat the minority’s preferred candidate, the third precondition under Gingles. To the contrary, the third part of Appendix A is dedicated to describing the election results over time in the 2003 version of Senate Districts 14, 20, 21, 28, 38, and 40, the 2009 version of House Districts 12, 21, 29, 31, 48, 99, and 107, and the 2001 version of Congressional Districts 1 and 12.[5] The trial court found that each highlighted district was a majority-minority district in its pre-2011 form. The trial court also found that in each of these districts, an African-American Democratic candidate had been successful over a Republican opponent. This is evidence that voters in these majority-minority districts tended to elect African-American Democratic candidates, thereby suggesting that the minority group is politically cohesive in those districts. The findings do not establish, however, that the majority votes in a manner that usually defeats the minority group’s preferred candidate of choice in those same districts.
The closest the findings come to demonstrating that the majority bloc votes in a way that usually defeats the minority group’s preferred candidate is by recalling that
[ n]o African American candidate elected in 2010 was elected from a majority-white crossover district.... From 2006 through 2010, no African American candidate was elected to more than two consecutive terms to the legislature in a majority-white district. From 1992 through 2010, *545 no black candidate for Congress was elected in a majority-white district.
From 2004 through 2010, no African American candidate was elected to state office in North Carolina in a statewide partisan election.
(Numeral and internal citations omitted.) These generalized findings have limited value. There is no indication that this set of data applies to the challenged VRA districts or reflects voting patterns over a period of time rather than the results of a single election. It is unlikely that the data would apply to the challenged VRA districts because they are all majority-minority districts, and many have been so under previous plans. In addition, generalized findings of fact do not constitute a district-by-district analysis as required by ALBC.
The trial court’s findings clearly indicate racially polarized voting, and Supreme Court decisions establish that evidence of racially polarized voting is relevant to the second and third preconditions, see Gingles, 478 U.S. at 56, 106 S. Ct. at 2769, 92 L. Ed. 2d at 50; however, the fact remains that Gingles requires a showing of all three preconditions. Without adequate findings of fact related to the third precondition, the trial court’s conclusion that all three preconditions have been met is unsupported by its findings. Therefore, I would remand this case to the trial court for adequate findings regarding the third precondition. It is worth noting that when one precondition is not satisfied, the General Assembly is not required to create a § 2 district. See Pender County, 361 N.C. at 499, 649 S.E.2d at 369. If the third precondition is not satisfied with respect to any district in a case such as this in which there is substantial evidence to suggest that race predominated the General Assembly’s redistricting decisions for the twenty-six VRA districts, it follows that the General Assembly developed a race conscious redistricting plan that was not justified by § 2 as a compelling state interest.
c.
The trial court’s narrow tailoring analysis also misses the mark in other respects. First, because the trial court failed to provide adequate findings of fact related to the third Gingles precondition, the trial court cannot rely on Strickland to conclude that creating VRA districts with a TBVAP greater than 50% was necessary to avoid liability under § 2. Second, ALBC disapproves of the use of mechanical numerical targets to avoid retrogression under § 5. Third, the General Assembly’s use of racial proportionality to establish the total number of VRA districts was impermissible under De Grandy. I will discuss each in turn.
*546 Plaintiffs argued at trial that drawing the VRA districts such that each would contain a TBVAP greater than 50%, thereby creating a majority-minority district, could not be narrow tailoring. The trial court rejected plaintiffs’ argument and determined that “the General Assembly had a strong basis in evidence for concluding that it was reasonably necessary to endeavor to create all VRA districts within the Enacted Plans with 50% TBVAP to protect the state from anticipated liability under § 2 of the VRA and to ensure preclearance under § 5 of the VRA.” The trial court relied upon this Court’s decision in Pender County v. Bartlett.
la. Pender County this Court considered “whether [the first Gingles] precondition, that a minority group must be ‘sufficiently large and geographically compact to constitute a majority in a single-member district,’ requires that the minority group constitute a numerical majority of the relevant population, or whether a numerous minority can satisfy the precondition.” Pender County, 361 N.C. at 499, 649 S.E.2d at 370 (citation omitted). The majority of this Court answered that question by creating a bright line rule: “[A] minority group that otherwise meets the Gingles preconditions [must] constitute a numerical majority of citizens of voting age ....” Id. at 504, 649 S.E.2d at 373. The Court reasoned that “[a] bright fine rule for the first Gingles precondition ‘promotes ease of application without distorting the statute or the intent underlying it’ ” and serves as a “safe harbor” for the General Assembly in the redistricting process. Id. at 505, 649 S.E.2d at 373 (quoting McNeil v. Springfield Park Dist., 851 F.2d 937, 942 (7th Cir. 1988), cert. denied, 490 U.S. 1031, 109 S. Ct. 1769, 104 L. Ed. 2d 204 (1989)). Affirming the majority’s conclusion, the Supreme Court in Strickland reiterated that “the disposi-tive question is: What size minority group is sufficient to satisfy the first Gingles requirement?” Strickland, 556 U.S. at 12, 129 S. Ct. at 1242, 173 L. Ed. 2d at 183 (plurality). The Court reasoned, as this Court did in Pender County, that a majority-minority rule provided “workable standards and sound judicial and legislative administration.” Id. at 17, 129 S. Ct. at 1244, 173 L. Ed. 2d at 186.
The trial court explained the Strickland holding as follows: “[W]hen the State has a strong basis in evidence to have a reasonable fear of § 2 liability, the State must be afforded the leeway to avail itself of the ‘bright line rule’ and create majority-minority districts, rather than cross-over districts, in those areas where there is a sufficiently large and geographically compact minority population and racial polarization exists.” Writing for the plurality in Strickland, Justice Kennedy made the following crucial observations:
*547 Our holding also should not be interpreted to entrench majority-minority districts by statutory command, for that, too, could pose constitutional concerns. States that wish to draw crossover districts are free to do so where no other prohibition exists. Majority-minority districts are only required if all three Gingles factors are met and if § 2 applies based on a totality of the circumstances. In areas with substantial crossover voting it is unlikely that the plaintiffs would be able to establish the third Gingles precondition — bloc voting by majority voters. In those areas majority-minority districts would not be required in the first place; and in the exercise of lawful discretion States could draw crossover districts as they deemed appropriate. States can — and in proper cases should — defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts. Those can be evidence, for example, of diminished bloc voting under the third Gingles factor or of equal political opportunity under the § 2 totality-of-the-circumstances analysis. And if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments. There is no evidence of discriminatory intent in this case, however. Our holding recognizes only that there is no support for the claim that § 2 can require the creation of crossover districts in the first instance.
Id. at 23-24, 129 S. Ct. at 1248-49, 173 L. Ed. 2d at 190-91 (emphases added) (internal citations omitted). Justice Kennedy’s qualification of the holding suggests that it is a mistake to interpret Strickland as requiring majority-minority districts in order to comply with § 2 under all circumstances. Taking into consideration the limitations of Strickland’s holding, it is not possible to determine whether all the majority-minority districts created by the General Assembly are required in this case because, as explained above, the trial court did not make adequate findings of fact regarding whether the third Gingles precondition was satisfied, necessitating the determination that there are inadequate findings of fact to support the conclusion that each of the VRA districts was justified.
*548 Even assuming that the State had a compelling interest in avoiding liability under VRA § 2 and obtaining preclearance under VRA § 5,[6] and assuming that the factors set forth in Thornburg v. Gingles have been properly addressed, the trial court’s findings with respect to the greater than 50% TBVAP threshold and proportionality do not support its ultimate conclusion that the redistricting plans pass strict scrutiny. Therefore, this Court should vacate and remand regarding the twenty-six VRA districts.
As explained in ALBC, “Alabama believed that, to avoid retrogression under § 5, it was required to maintain roughly the same black population percentage in existing majority-minority districts.” 575 U.S. at _, 135 S. Ct. at 1263, 191 L. Ed. 2d at 324. The Supreme Court rejected this view by establishing that, to avoid “forbidden retrogression,” setting fixed percentages or pursuing a “mechanically numerical view” differs significantly from a “more purpose-oriented view,” id. at _, 135 S. Ct. at 1273, 191 L. Ed. 2d at 335, which inquires whether “minority voters retain the ability to elect their preferred candidates,” id. at _, 135 S. Ct. at 1273, 191 L. Ed. 2d at 334. As the Supreme Court explained:
[ W]e conclude that the District Court and the legislature asked the wrong question with respect to narrow tailoring. They asked: “How can we maintain present minority percentages in majority-minority districts?” But given § 5’s language, its purpose, the Justice Department Guidelines, and the relevant precedent, they should have asked: “To what extent must we preserve existing minority percentages in order to maintain the minority’s present ability to elect the candidate of its choice?” Asking the wrong question may well have led to the wrong answer. Hence, we cannot accept the District Court’s “compelling interest/ narrow tailoring” conclusion.
Id. at _, 135 S. Ct. at 1274, 191 L. Ed. 2d at 336.
Similarly, the North Carolina General Assembly did not ask the right question. The trial court here found that “it is undisputed that *549 the General Assembly intended to create 26 of the challenged districts to be [VRA districts] and that it set about to draw each of these VRA districts so as to include at least 50% [TBVAP].” Although Alabama and North Carolina sought to avoid retrogression differently — by drawing the challenged districts so as to maintain the same percentage of minority voters in Alabama, and to ensure at least 50% TBVAP in North Carolina — both legislatures used a mechanical numerical target in that effort. This is precisely what ALBC forbids.
Under a § 5 retrogression analysis conducted in accordance with ALBC, the trial court must consider to what extent the number of minority voters within each existing majority-minority district must change, if at all. If, within an existing majority-minority district, the minority group is able to elect the candidate of its choice, based on the record of evidence related to voting patterns and other indicia, there are no grounds to increase the minority voter percentages under § 5. Conversely, if the minority group within an existing majority-minority district is no longer able to elect the candidate of its choice because of demographic shifts or other changes, then § 5 requires an increase in the percentage of minority voters within that district to avoid retrogression. Without asking the correct question — -“To what extent must we preserve existing minority percentages in order to maintain the minority’s present ability to elect the candidate of its choice?” — the trial court authorized the legislature to move minority voters into certain districts based solely on their race without justification.
Finally, the General Assembly endeavored “to create as many VRA districts as needed to achieve a ‘roughly proportionate’ number of Senate, House and Congressional districts as compared to the Black population in North Carolina.” The General Assembly reasoned that, because 21% of North Carolina’s voting age population identified as any part Black, roughly 21% of the Senate, House, and Congressional seats should be filled by candidates elected by voters in VRA districts, i.e., majority-minority districts. The trial court found that the General Assembly used rough proportionality as a “benchmark” for the number of VRA districts it would create, and the court concluded that this methodology was appropriate to avoid any potential § 2 liability. But as I noted in my previous dissent, this conclusion is based on a misapprehension of De Grandy.
In De Grandy the State of Florida argued “that as a matter of law no dilution occurs whenever the percentage of single-member districts in which minority voters form an effective majority mirrors the minority *550 voters’ percentage of the relevant population.” 512 U.S. at 1017, 114 S. Ct. at 2660, 129 L. Ed. 2d at 795. The Supreme Court rejected this safe harbor rule because such a rule “would be in derogation of the statutory text and its considered purpose, however, and of the ideal that the Voting Rights Act of 1965 attempts to foster. An inflexible rule would run counter to the textual command of § 2, that the presence or absence of a violation be assessed ‘based on the totality of circumstances.’ ” Id. at 1018, 114 S. Ct. at 2660, 129 L. Ed. 2d at 795 (citation omitted). In addition, such a rule would lead to a tendency on the part of the State to create majority-minority districts even when they may not be necessary to achieve equal opportunity for a minority voter to elect his or her preferred candidate. Id. at 1019-20, 114 S. Ct. at 2661, 129 L. Ed. 2d at 796.
Here, however, defendants’ public statements undermine their adherence to the applicable standards and demonstrate the central role proportionality played in the 2011 redistricting plan. On 17 June 2011, defendants announced a public hearing concerning redistricting issues, in which defendants expressed the intention to propose redistricting plans containing a sufficient number of majority-minority districts to provide substantial proportionality. Defendants proposed “that each plan include a sufficient number of majority African American districts to provide North Carolina’s African American citizens with a 'substantially proportional and equal opportunity to elect their preferred candidate of choice.” Defendants explained that “proportionality for the African American citizens in North Carolina means the creation of 24 majority African American House districts and 10 majority Senate districts. . . . Unlike the 2003 benchmark plans, the Chairs’ proposed 2011 plans will provide substantial proportionality for North Carolina’s African American citizens.”
In fight of its misreading of De Grandy, the trial court cites approvingly defendants’ use of proportionality as the “benchmark” for creating the Enacted Plans — beginning with proportionality as the goal and then working backwards to achieve that goal. Similarly, the trial court reasoned: “When the Supreme Court says ‘no violation of § 2 can be found’ under certain circumstances, prudence dictates that the General Assembly should be given the leeway to seek to emulate those circumstances in its Enacted Plans.” (Quoting De Grandy, 512 U.S. at 1000, 114 S. Ct. at 2651, 129 L. Ed. 2d at 784.) But this approach is precisely what the Supreme Court rejected in De Grandy: proportionality is relevant as a means to an end (compliance with the VRA), but it is not an end in itself and it does not — contrary to the trial court’s reasoning — provide a safe harbor for redistricting plans premised on race. The Court in *551 De Grandy centered its analysis on the role of proportionality in the totality-of-the-circumstances analysis in a § 2 claim. See id. at 1013-14, 114 S. Ct. at 2658, 129 L. Ed. 2d at 792-93 (“The court failed to ask whether the totality of facts, including those pointing to proportionality, showed that the new scheme would deny minority voters equal political opportunity.” (footnote call number omitted)). The Court made clear that equal political opportunity is the focus of the inquiry, not proportionality. By not focusing on whether the Enacted Plans denied minority voters equal political and electoral opportunity, the trial court misapplied the law, resulting in an erroneous conclusion that defendants’ use of proportionality as an end is constitutionally permissible.
The majority concludes that “the record here demonstrates that the General Assembly did not use proportionality improperly to guarantee the number of majority-minority voting districts based on the minorily members’ share of the relevant population.” The majority is only able to draw this conclusion by overlooking the trial court’s determination— based upon “the undisputed evidence” — that the General Assembly used proportionality as a “benchmark.” The majority’s conclusion becomes more confusing given its statement that “[w]e believe that such an effort, seeking to guarantee proportional representation, proportional success, or racial balancing, would run afoul of the Equal Protection Clause.” (Citing De Grandy, 512 U.S. at 1017-22, 114 S. Ct. at 2658-62, 129 L. Ed. 2d at 794-98.) I agree “that such an effort... would run afoul of the Equal Protection Clause,” and its use in this instance has that effect.
By characterizing the General Assembly’s consideration of race as a “precautionary consideration” used “as a means of protecting the redistricting plans from potential legal challenges under section 2’s totality of the circumstances test,” the majority appears to join the trial court in using race as a legislative safe harbor in derogation of the clear prohibition against reliance upon such criteria set forth by the Supreme Court of the United States. De Grandy, 512 U.S. at 1018-20, 114 S. Ct. at 2660-61, 129 L. Ed. 2d at 795-97. In light of these errors, this Court should vacate the trial court’s Judgment and remand the case for reconsideration under a correct understanding of the law.
Based on the foregoing, I would remand this case to the trial court for more complete findings of fact on the VRA districts with respect to whether the General Assembly subordinated traditional redistricting principles to racial considerations, with respect to the third Gingles precondition, and with respect to the proper application of the non-retrogression requirement. Even if race predominated the General Assembly’s motivations and §§ 2 and 5 constitute compelling state *552 interests, the trial court’s findings of fact do not suffice to support a conclusion that the Enacted Plans were narrowly tailored to achieve those interests and did not violate the Equal Protection Clause of the Fourteenth Amendment.
On remand, the trial court should begin by determining how many majority-minority districts, if any, need to be created and where those districts should be located in order to comply with § 2 and § 5. In addition, after determining the total number of majority-minority districts needed to comply with the VRA, the trial court should determine, where necessary, the percentages of TBVAP in each district needed to ensure the minority group’s present ability to elect its candidate of choice and to avoid retrogression. In answering these questions on remand, the trial court should engage in the following district-by-district analysis in accordance with the directives provided in ALBC and existing law.
As to the former inquiry, the trial court must look to § 2 and consider whether defendants have established the existence of the three mandatory Gingles preconditions for each majority-minority district that defendants created, and if so, whether the totality of the circumstances establishes that each of these districts was required by § 2 (unless the creation of that district was mandated by a prior court order that remains in effect[7]). Again, proportionality may be considered in the totality-of-the-circumstances determination but must not be the starting point for a redistricting plan. To the extent that defendants fail to establish that any of the majority-minority districts were required by § 2 based on the existence of the three mandatory Gingles factors and the totality of the circumstances, or a valid court order, the creation of such a majority-minority district is not justified.
As to the latter inquiry, the trial court must look to § 5 and determine on a district-by-district basis which actions, if any, were necessary to ensure non-retrogression in any district created pursuant to § 5. In doing so, the court should look to the districts as they existed under the prior redistricting plan to discern the TBVAP of each district and whether the minority group had the ability to elect its candidate of choice in that district. In the event the answer to that question is in the negative, then the *553 court needs to determine what TBVAP is needed to permit the election of the minority group’s candidate of choice. In the event that the answer to that question is in the affirmative, then the court must determine whether defendants impermissibly increased the TBVAP in that district.
II.
Plaintiffs also challenged four non-VRA districts, which are districts with a TBVAP of less than 50% — Congressional Districts 12 and 4, Senate District 32, and House District 54. The discussion in ALBC concerning the proper analysis for determining whether race was the predominant motivating factor in drawing the districts supports the conclusion that the trial court viewed equalizing population among the districts as a traditional redistricting principle rather than as “part of the redistricting background, taken as a given.” 575 U.S. at _, 135 S. Ct. at 1270, 191 L. Ed. 2d at 332.
The Court in ALBC was clear in its instruction that “an equal population goal is not one factor among others to be weighed against the use of race to determine whether race ‘predominates.’ Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator’s determination as to how equal population objectives will be met.” Id. at _, 135 S. Ct. at 1270, 191 L. Ed. 2d at 332. The majority, in its attempt to show that the principles articulated in ALBC do not apply to the case at bar, reasons that, “[i]n effect, North Carolina’s Whole County Provision, of which equal population is a component, establishes a framework to address the neutral redistricting requirement that ‘political subdivisions’ be respected.” In its framing of the Whole County Provision, the majority essentially concludes that equal population is a traditional redistricting principle in North Carolina and, in the process, ignores the Supreme Court’s holding that equal population is not a traditional redistricting principle to be weighed among other such principles.
In concluding that the non-VRA districts were not drawn with race as the predominant motivation, the trial court explained:
Based upon these findings of fact, the trial court concludes that the shape, location and composition of the four non-VRA districts challenged by the Plaintiffs as racial gerrymanders was dictated by a number of factors, which included a desire of the General Assembly to avoid § 2 liability and to ensure preclearance under § 5 of the VRA, but also included equally dominant legislative motivations to comply with the Whole County Provision, *554 to equalize population among the districts, to protect incumbents, and to satisfy the General Assembly’s desire to enact redistricting plans that were more competitive for Republican candidates than the plans used in past decades or any of the alternative plans.
(Emphases added.) This statement reflects the trial court’s understanding that equalizing population was as relevant to its predominance analysis as other legislative motivations, including compliance with the Whole County Provisions, protection of incumbents, and creating districts in which Republicans would be more competitive. The trial court’s more specific findings of fact in Appendix B of the Judgment related to Congressional Districts 4 and 12 provide further evidence of the trial court’s view of equal population as a factor to be weighed. The trial court found that, in Congressional District 4, “[a]ll of the divisions were done to equalize population among the Fourth Congressional District and the adjoining Congressional districts, to make the district contiguous, or for political reasons. None of the [Vote Tabulation Districts] were divided based upon racial data.” Similarly, the trial court found that, in the Twelfth Congressional District, “[a]ll of [the] divisions were done to equalize population among the Twelfth Congressional District and other districts or for political reasons.” If the trial court were to remove equalizing population as a traditional redistricting factor in accordance with ALBC, it would be left to consider only whether these two factors were subordinated to racial considerations: making the Fourth Congressional District contiguous and political considerations. In the case of the Twelfth Congressional District, the trial court would be left with only political reasons to weigh against race. This balance is particularly troublesome in the case of Congressional District 12.
The shape of Congressional District 12 has been the subject of much litigation over the last two decades, and for good reason. See, e.g., Easley v. Cromartie, 532 U.S. 234, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001) (Cromartie II); Hunt v. Cromartie, 526 U.S. 541, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999); Shaw II, 517 U.S. 899, 116 S. Ct. 1894, 135 L. Ed. 2d 207; Shaw I, 509 U.S. 630, 113 S. Ct. 2816, 125 L. Ed. 2d 511. In Cromartie II the Supreme Court observed that “racial identification correlates highly with political affiliation” in North Carolina, 532 U.S. at 258, 121 S. Ct. at 1466, 149 L. Ed. 2d at 453, and that the plaintiffs in that case “ha[d] not successfully shown that race, rather than politics, predominantly account[ed] for” the shape, location, and composition of the 1997 version of Congressional District 12, id. at 257, 121 S. Ct. 1466, 149 L. Ed. 2d at 453. Here the trial court found as fact that Congressional *555 District 12 (and District 4) were drawn based on the locations where President Obama received the highest voter totals during the 2008 presidential election. Even if these voter totals were “[t]he only information on the computer screen,” we cannot ignore the fact that race played an extraordinary role in that election. See Bob Hall, 2008Recap: Same-Day Registration & Other Successes, Democracy North Carolina (Dec. 26, 2008, updated Mar. 19, 2009), http://www.democracy-nc.org/downloads/ WrapUpYearofVoterPR2008.pdf (“[I]n 2008, a record 72% of registered blacks voted, which surpassed the rate of whites (69%) for the first time. ... That record level of participation proved crucial for many candidates, beginning with Obama.”). To justify this serpentine district, which follows the 1-85 corridor between Mecklenburg and Guilford Counties, on partisan grounds allows political affiliation to serve as a proxy for race and effectively creates a “magic words” test for use in evaluating the lawfulness of this district. Because race and politics historically have been and currently remain intertwined in North Carolina, the record contains evidence tending to suggest that politics are no more than a pretext for this excruciatingly contorted district. Therefore, given the inadequacy of its findings of fact, the trial court erred by concluding that “the shape, location and composition of [this district]... included equally dominant legislative motivations ... to protect incumbentsf ] and to . . . enact redistricting plans that were more competitive for Republican candidates.” Upholding this district’s tortured construction creates an incentive for legislators to stay “on script” and avoid mentioning race on the record, and in this instance, it is disingenuous to suggest that race is not the predominant factor. As such, this Court should vacate and remand as to Congressional District 12.
With respect to Senate District 32, plaintiffs contend that the trial court’s findings actually undermine its conclusion that strict scrutiny does not apply because the non-VRA districts are not race-based. The trial court found the following relevant facts:
204. As was true under the 2000 Census, under the 2010 Census there is insufficient TBVAP in Forsyth County to draw a majority-TBVAP Senate district in Forsyth County. However, because of concerns regarding the State’s potential liability under § 2 and § 5, Dr. Hofeller was instructed by the redistricting chairs to base the 2011 Senate District 32 on the 2003 versions of Senate District 32.
[[Image here]]
*556 207. The first version of Senate District 32 that was released by the General Assembly had a TBVAP of 39.32%. Subsequently, the [AFRAM][8] plan was released. Its version of District 32 was located in a three-county and three-district group (Forsyth, Davie, Davidson). The [AFRAM] District 32 had a TBVAP of 41.95%. The [AFRAM] District 32 was a majority-minority coalition district "with a non-Hispanic white population of 43.18%.
208. The redistricting chairs were concerned that any failure to match the TBVAP % found in the [AFRAM] District 32 could potentially subject the state to liability under § 2 or § 5 of the VRA. Therefore, Dr. Hofeller was instructed by the Redistricting Chairs to re-draw the State’s version of Senate District 32 so that it would at least equal the [AFRAM] version in terms of TBVAP.
As discussed above, the Supreme Court has held that when redistricting plans drawn in an attempt to preempt VRA § 2 litigation or obtain VRA § 5 preclearance are predominantly race-based, such plans attract strict scrutiny. See Vera, 517 U.S. at 959, 116 S. Ct. at 1952, 135 L. Ed. 2d at 257; Shaw II, 517 U.S. at 906, 116 S. Ct. at 1901, 135 L. Ed. 2d at 219; Miller, 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782.
The trial court acknowledged that compliance with the VRA was a motivating factor behind the enacted plans, but concluded that “comply[ing] with the Whole County Provision,... equalizing] population among the districts,... protecting] incumbents, and... satisfying] the General Assembly’s desire to enact redistricting plans that were more competitive for Republican candidates” were “equally dominant legislative motivations.” But, in the section of its fact-finding Judgment addressing Senate District 32, the trial court made no findings regarding these other considerations. While the evidence might support such a conclusion, the trial court’s actual findings do not. Accordingly, this Court should vacate the trial court’s Judgment and remand this case to the trial court to address whether race was the predominant motivation behind the shape, location, and composition of Senate District 32.
With respect to House District 54 and Congressional District 4, the trial court also found that race was not the predominant motivating *557 factor. Plaintiffs do not contest these determinations, and they are binding on appeal. Koufman v. Koufman, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). As stated above, however, because the shapes and compositions of the four non-VRA districts are necessarily affected by the VRA districts, it would be impossible to vacate and remand piecemeal.
Because I conclude that the issue of whether race was the predominant motivating factor in drawing the non-VRA districts should be remanded to the trial court for more complete findings of fact taking into account the guidance provided by ALBC, I do not find it necessary to address the trial court’s application of the rational basis test or the majority’s approval of it.
III.
Plaintiffs contend that the trial court erred in concluding that the enacted House and Senate plans do not violate the provisions of the state constitution, which dictate that “[n]o county shall be divided in the formation of a senate district,” N.C. Const, art. II, § 3(3), and “[n]o county shall be divided in the formation of a representative district,” id. § 5(3). In Stephenson v. Bartlett, 355 N.C. 354, 562 S.E.2d 377 (2002) (Stephenson I), this Court construed the Whole County Provisions in light of federal law and “mandated that in creating legislative districts, counties shall not be divided except to the extent necessary to comply with federal law, including the ‘one-person, one-vote’ principle and the VRA.” Stephenson v. Bartlett, 357 N.C. 301, 309, 582 S.E.2d 247, 251-52 (2003) (Stephenson II) (citing Stephenson I, 355 N.C. at 363-64, 562 S.E.2d at 384-85). To ensure complete compliance with federal law and to provide maximum enforcement of the Whole County Provisions, this Court “outlined in Stephenson I the following requirements that must be present in any constitutionally valid redistricting plan”:
[ 1.] ... [T]o ensure full compliance with federal law, legislative districts required by the VRA shall be formed prior to creation of non-VRA districts_In the formation of VRA districts within the revised redistricting plans on remand, we likewise direct the trial court to ensure that VRA districts are formed consistent with federal law and in a manner having no retrogressive effect upon minority voters. To the maximum extent practicable, such VRA districts shall also comply with the legal requirements of the WCP, as herein established ....
[ 2.] In forming new legislative districts, any deviation from the ideal population for a legislative *558 district shall be at or within plus or minus five percent for purposes of compliance with federal “one-person, one-vote” requirements.
[ 3.] In counties having a 2000 census population sufficient to support the formation of one non-VRA legislative district . . . , the WCP requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county.
[ 4.] When two or more non-VRA legislative districts may be created within a single county,... single-member non-VRA districts shall be formed within said county. Such non-VRA districts shall be compact and shall not traverse the exterior geographic boundary of any such county.
[ 5.] In counties having a non-VRA population pool which cannot support at least one legislative district... or, alternatively, counties having a non-VRA population pool which, if divided into districts, would not comply with the ... “one-person, one-vote” standard, the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent “one-person, one-vote” standard. Within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the “exterior” line of the multi-county grouping-, provided, however, that the resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent “one-person, one-vote” standard.
[ 6.] The intent underlying the WCP must be enforced to the maximum extent possible; thus, only the smallest number of counties necessary to comply with the at or withinplus or minus five percent “one-person, one-vote” standard shall be combined[.]
*559 [ 7.] . . . [CJommunities of interest should be considered in the formation of compact and contiguous electoral districts.
[ 8.] . . . [M]ulti-member districts shall not be used in the formation of legislative districts unless it is established that such districts are necessary to advance a compelling governmental interest.
[ 9.] Finally, we direct that any new redistricting plans, including any proposed on remand in this case, shall depart from strict compliance with the legal requirements set forth herein only to the extent necessary to comply -with federal law.
Stephenson II, 357 N.C. at 305-07, 582 S.E.2d at 250-51 (alterations in original) (emphases added) (quoting Stephenson I, 355 N.C. at 383-84, 562 S.E.2d at 396-97).
The majority concludes that its analysis of the Enacted Plans under the Whole County Provisions remains “unaffected” by ALBC. Yet, a Whole County Provisions analysis conducted in accordance with the framework set forth in Stephenson I, requires application of the nine rules listed above, the first of which is premised on designing any legislative districts required by the VRA. Stephenson I, 355 N.C. at 383, 562 S.E.2d at 396-97. One cannot sever compliance with the VRA from compliance with the Whole County Provisions. Because ALBC provides legal principles that must be applied in determining the constitutionality of VRA districts, ALBC affects an analysis under the Whole County Provisions, albeit indirectly.
In view of the necessity for a remand to the trial court to address the equal protection claim, the trial court must also address the Whole County Provisions issue on remand given that the General Assembly, in attempting to comply with Stephenson I’s Rule 1, drew the VRA districts before applying Rules 2 through 9. Because I conclude that the trial court’s findings of fact fail to establish that the VRA districts are constitutional, the trial court must, after making a valid determination relating to the VRA districts, and to the extent necessary, revisit the Whole County Provisions issues as well. Simply put, to the extent that the VRA districts are unconstitutional, that fact would necessarily affect the result reached with respect to the General Assembly’s application of the rubric set forth in Stephenson I. See Pender County, 361 N.C. at 508-09, 649 S.E.2d at 375 (concluding that a house district created with the intent to comply with VRA § 2 was not required by the VRA and *560 thus, “must be drawn in accordance with the WCP and the Stephenson I requirements”). As such, I would vacate and remand on this issue.
IV.
When addressing the parties’ arguments in support of and in opposition to the Enacted Plans, we cannot lose sight of the purpose of the VRA. The House Report accompanying the original Voting Rights Act of 1965 noted:
A salient obligation and responsibility of the Congress is to provide appropriate implementation of the guarantees of the 15th amendment to the Constitution. Adopted in 1870, that amendment states the fundamental principle that the right to vote shall not be denied or abridged by the States or the Federal Government on account of race or color.
The historic struggle for the realization of this constitutional guarantee indicates clearly that our national achievements in this area have fallen far short of our aspirations. The history of the 15th amendment litigation in the Supreme Court reveals both the variety of means used to bar Negro voting and the durability of such discriminatory policies [such as grandfather clauses, white primaries, racial gerrymandering, improper challenges, and the discriminatory use of tests].
The past decade has been marked by an upsurge of public indignation against the systematic exclusion of Negroes from the polls that characterizes certain regions of this Nation.
H.R. Rep. No. 89-439, at 8 (1965) (titled “Voting Rights Act of 1965”), as reprinted, in 1965 U.S.C.C.A.N. 2437, 2439-40 (citations omitted). In Gingles the Supreme Court noted the “historical pattern of statewide official discrimination” in North Carolina.[9] 478 U.S. at 39, 106 S. Ct. at 2760, 92 L. Ed. 2d at 39. The VRA was intended to remove barriers to *561 enfranchisement and ensure that new barriers did not arise in their place; however, “[s]ince the adoption of the Voting Rights Act [some] jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices that dilute minority voting strength.” De Grandy, 512 U.S. at 1018, 114 S. Ct. at 2660, 129 L. Ed. 2d at 795 (second and third alterations in original) (citation and internal quotation marks omitted). Although those new barriers may not look the same as the old barriers, it is this Court’s duty to identify and invalidate policies or tactics that effectively impede the minority group’s ability to elect its candidate of choice in compliance with the VRA and the Equal Protection Clause.
Here, even if the legislature considered traditional redistricting principles, such as compactness and the protection of incumbents or other political motivations, the fact remains that the General Assembly started with the premise that African-American voters in North Carolina should only be guaranteed the opportunity to elect candidates of their choice to 21% of the seats in each chamber. From there, the legislature worked backwards to avoid liability under § 2 and ensure precleaxance under § 5. The implications of such a premise reach beyond the challenged VRA districts, affecting the non-VRA districts as well.
When the legislature purposely carves out majority-minority districts, increasing or decreasing the TBVAP by a few percentage points while maintaining a greater than 50% TBVAP, the district-drawing process necessarily requires the identification of voters by race and the movement of the district lines to incorporate or exclude those voters accordingly. This scheme compels the question: Is the ability of the minority voters who are suddenly no longer represented by their preferred candidate of choice in a VRA district unimportant? If the only way to ensure that the minority group has the ability to elect the candidate of its choice is to create majority-minority districts, the General Assembly has the power to determine which of the voters in the minority group will be represented by the candidate of their choice, and which voters will not.
*562 Writing separately in De Grandy, Justice Kennedy warned:
Operating under the constraints of a statutory regime in which proportionality has some relevance, States might consider.it lawful and proper to act with the explicit goal of creating a proportional number of majority-minority districts in an effort to avoid § 2 litigation.. . . Those governmental actions, in my view, tend to entrench the very practices and stereotypes the Equal Protection Clause is set against. As a general matter, the sorting of persons with an intent to divide by reason of race raises the most serious constitutional questions.
Id. at 1029, 114 S. Ct. at 2666, 129 L. Ed. 2d at 802 (Kennedy, J., concurring) (internal citation omitted). In my view, the trial court’s decision to uphold the Enacted Plans in the absence of adequate findings demonstrates that Justice Kennedy’s concerns may be well-founded.
For all the complexity of VRA jurisprudence, the bottom line is that the manipulation of district lines based on race to a greater extent than necessary to comply with the VRA is unconstitutional. The record in this case contains evidence tending to show that the General Assembly used numerical targets formulated by racial considerations to avoid liability under § 2 and ensure preclearance under § 5 without fully considering whether the decisions made were necessary to enable the minority group to elect its preferred candidate of choice in compliance with the VRA.[10] Any such scheme would be unconstitutional. The trial court’s findings are not adequate to support a conclusion that this unconstitutional scheme did not occur. Any impermissibly racially gerrymandered districts affect the entire state under the Whole County Provisions of the North Carolina Constitution. For any of these errors, this Court would do well to vacate and remand rather than prematurely affirm a defective districting plan.
*563 Accordingly, I concur in that part of the majority’s opinion regarding plaintiffs’ remaining state claims related to the “Good of the Whole” Clause in Article I, Section 2 of the Constitution of North Carolina, and respectfully dissent from those parts of the opinion affirming the trial court’s erroneous judgment.
Justices HUDSON and ERVIN join in this opinion.

. The State took a contraiy view of the Supreme Court’s order vacating our previous judgment. During oral arguments, in response to Justice Hudson’s question, “What do you think that the U.S. Supreme Court wants us to do?”, the State replied: “The Supreme Court often remands cases when a landmark decision like Alabama comes out and quite often the court that gets the remand reaffirms their decision and the Supreme Court doesn’t take review of it. So, the Supreme Court did not make any opinions or judgments on the North Carolina plans. They just asked this Court to take a look at it as an initial matter and based upon the standards that they articulated mAlabama.... They want you to look to see if the test in Alabama is the same one that you applied in your previous decision. And whether under that test should these plans still be reaffirmed. They are giving you the first chance to malee that decision instead of them taking the time to look through the case. And again, that’s quite common in Supreme Court jurisprudence for remand to take place and for the lower court to reaffirm its decision and for the' Supreme Court of the United States not to take the appeal back.” Data disc: Oral Argument 31 August 2015 201PA12-3 Dickson v. Rucho.

. The Supreme Court declined to speak to the plaintiffs’ § 2 vote dilution claim. ALBC, 575 U.S. _, 135 S. Ct. at 1274, 191 L. Ed. 2d at 336.

. “If, however, [the] plaintiff] ] cannot show that race was the ‘predominant factor’ to which traditional districting principles were ‘subordinated,’ and thus cannot meet the threshold for triggering strict scrutiny, it follows that the facially neutral classification (the electoral district) will be subject, at most, to rational basis review.” Quilter v. Voinovich, 981F. Supp. 1032, 1050 (N.D. Ohio 1997) (citing Miller, 515 U.S. at 915-16, 115 S. Gt. at 2488, 132 L. Ed. 2d at 779-80), aff’d mem., 523 U.S. 1043, 118 S. Ct. 1358, 140 L. Ed. 2d 508 (1998).

. See, e.g., Bush v. Vera, 517 U.S. 952, 958-59, 116 S. Ct 1941, 1951-52, 135 L. Ed. 2d 248, 257 (1996) (plurality) (explaining that strict scrutiny applies when race is “the predominant factor” in a legislature’s redistricting plan) (citation, emphasis, and internal quotation marks omitted); Id. at 1002-03, 116 S. Ct. at 1974, 135 L. Ed. 2d at 286 (Thomas & Scalia, JJ., concurring in the judgment) (explaining that Texas’s admission that “it intentionally created majority-minority districts” in order to comply with the VRA was “enough to require application of strict scrutiny in this suit”); Shaw II, 517 U.S. at 906, 116 S. Ct. at 1901, 135 L. Ed. 2d at 219 (“fail[ing] to see how” a court could reach any conclusion other than that “race was the predominant factor” in the General Assembly’s drawing of redistricting lines when the State admitted that its “overriding purpose” was to obtain preclearance from DOJ) (citation, emphasis, and quotation marks omitted); Miller, 515 U.S. at 918-19, 115 S. Ct. at 2489, 132 L. Ed. 2d at 780-81 (concluding that Georgia’s express “desire” to obtain preclearance was “powerful evidence that the legislature subordinated traditional districting principles to race when it ultimately enacted a plan creating three majority-black districts” and thus strict scrutiny applied).

. The 2011 versions of each of these districts are challenged by plaintiffs as racial gerrymanders.

. The United States Supreme Court has repeatedly assumed, without deciding, that compliance with the VRA can be a compelling state interest in the strict scrutiny context, but that Court has not expressly decided the issue. See Shaw II, 517 U.S. at 915, 116 S. Ct. at 1905, 135 L. Ed. 2d at 225 (“We assume, arguendo, for the purpose of resolving this suit, that compliance with § 2 could be a compelling interest_”); Miller, 515 U.S. at 921, 115 S. Ct. at 2490,132 L. Ed. 2d at 782 (assuming that satisfying “the Justice Department’s preclearance demands” can be compelling interest).

. The trial court’s findings suggest that the General Assembly believed that it was obligated to create and maintain certain majority-Black districts in accordance with Gingles v. Edmisten, 590 F. Supp. 345, 365-66 (E.D.N.C. 1984), aff’d in part, rev’d in part sub nom. Thornburg v. Gingles, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986), and Cromartie v. Hunt, 133 F. Supp. 2d 407, 408 (E.D.N.C. 2000), rev’d sub nom. Easley v. Cromartie, 532 U.S. 234, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001), based upon advice received from the University of North Carolina School of Government and other sources.

. The trial court mistakenly refers to plaintiffs’ alternative redistricting map as being proposed by the Southern Coalition for Social Justice; it was actually drawn by the Alliance for Fair Redistricting and Minority Voting Rights (AFRAM).

. The Court in Gingles summarized the trial court’s findings on the types of voting discrimination mechanisms that persisted in North Carolina. The trial court found that “North Carolina had officially discriminated against its black citizens with respect to their exercise of the voting franchise from approximately 1900 to 1970 by employing at different times a poll tax, a literacy test, a prohibition against bullet (single-shot) voting and designated seat plans for multimember districts”; that “historic discrimination in education, *561 housing, employment, and health services had resulted in a lower socioeconomic status for North Carolina blacks as a group than for whites”; that North Carolina had a majority vote requirement for primaries that operated as an impediment to African-American voters’ ability to elect their preferred candidates of choice; that white candidates appealed to racial prejudice; that African-Americans enjoyed very little electoral success; and that “voting in the challenged districts was racially polarized.” Gingles, 478 U.S. at 38-41, 106 S. Ct. at 2760-61, 92 L. Ed. 2d at 39-41 (footnote call numbers omitted).

. The amici constitutional law professors point out that “[t]he distinction between the affirmative purpose of complying with federal law and a state’s negative interest in avoiding future liability is constitutionally significant. A legislature concerned about compliance with the Voting Rights Act is ultimately pursuing the same goal of protecting the minority voters whom ‘Acts such as the Voting Rights Act sought to help,’ ALBC, 135 S. Ct. at 1263, and has a strong motivation to craft its redistricting to that end. A legislature intent on avoiding future liability is likely to do no more than the minimum necessary to escape legal difficulties: its interests and those of minority voters are not the same and, indeed, potentially are in conflict.”